PUBLISHED

*VIRGINIA:*

*In the Court of Appeals of Virginia on* **Tuesday** *the* **6th** *day of* **May, 2014**.

James Robert Altizer,                                                                                         Petitioner,

 against                    Record No. 1280-13-3

Commonwealth of Virginia,                                                                                 Respondent.

Upon a Petition for a Writ of Actual Innocence

Before Judges Frank, Humphreys and Chafin

Keith William Diener (Art of Lawyering PLLC, on briefs), for petitioner.

Susan Mozley Harris, Assistant Attorney General (Mark R. Herring, Attorney General, on briefs), for respondent.

James Robert Altizer ("Altizer") petitions this Court to grant a writ of actual innocence based on non-biological evidence pursuant to Code §§ 19.2-327.10 through 19.2-327.14.  Altizer seeks to vacate his February 2, 2009 conviction for forcible sodomy in violation of Code § 18.2-67.1.  In support of his petition, Altizer proffers three witnesses' affidavits that purportedly demonstrate the minor-victim's "scheme to defraud the court."  Altizer alternatively argues that if this Court should not see fit to grant his petition, it should order an evidentiary hearing to further develop the facts underlying his claim of actual innocence.  For the reasons that follow, we dismiss his petition.

I.  BACKGROUND

A.  Altizer's Trial and Conviction

On October 8, 2008, Altizer was tried and convicted in a bench trial by the Montgomery County Circuit Court ("trial court") for sodomizing a ten-year-old male child, in violation of Code § 18.2-67.1.  The Commonwealth presented the testimony of the victim, J.Y. (also "A.Y."), and the victim's mother, Teresa

Young ("Teresa"). Altizer's live-in partner of thirteen years, Jay Phillips, Jr. ("Uncle Jay"), was J.Y.'s biological uncle and Teresa's brother. J.Y. testified that on December 28, 2007, he spent the night at Uncle Jay and Altizer's home. There was also a four-year-old boy who was spending the night. J.Y. had previously visited Uncle Jay and Altizer's trailer several times before without incident. While Uncle Jay was asleep on the couch in the living room, Altizer invited J.Y. to the master bedroom at the back of the trailer to see something. Once inside, Altizer threw J.Y. on the bed, pulled off J.Y.'s pants and underwear, and performed fellatio on J.Y. Altizer stopped when "[h]e heard like a car door and he ran out of the room."

Initially, J.Y. did not tell anyone about the incident because he was afraid that it was going to ruin his family. After J.Y. heard his friends discussing another man who was a child molester, he decided to tell his mom what happened. According to Teresa's testimony, several months after the incident J.Y. came out of his room at 11:30 p.m. to tell her something. He was crying hysterically. He told her that he had been molested. It took him about fifteen minutes to calm down and stop crying. She called the police that evening and by the time they arrived J.Y. had calmed down. Teresa acknowledged at trial that she had to correct J.Y. about the date of the offense after he spoke to the police. He originally said it happened on New Year's Eve, but J.Y. actually spent the night at Altizer's several days before New Year's Eve, on December 28th.

After J.Y. and Teresa testified, the Commonwealth rested. The Commonwealth presented no physical evidence of the crime.

Altizer called four witnesses on his behalf: Uncle Jay; Patrick J. Phillips, Uncle Jay's adult son; Brandy Grundhl, Altizer's friend; and Michael Adams, Altizer and Uncle Jay's roommate. Altizer's witnesses contradicted some of the details of the event that J.Y. recalled—the date of the incident, the layout of the furniture in the residence, and who was present the night of the incident and at what times.

The Commonwealth called one rebuttal witness, Investigator Brad Roop. Investigator Roop testified that Altizer admitted to him that he had not known J.Y. to lie or to make up stories.

Noting that J.Y. was an especially articulate child, the trial court found that "[J.Y.] [wa]s a credible witness." Considering all the evidence, the trial court found Altizer guilty of forcible sodomy.

### B.  Post-Trial Proceedings

Altizer's trial counsel filed a petition for appeal and a motion to withdraw as counsel with this Court. The argument asserted in the petition for appeal was that the trial court erred in affording greater weight to the testimony of the victim over the testimony of the defense witnesses.  This Court granted counsel's motion to withdraw and denied the petition for appeal.  In that October 22, 2009 per curiam order, this Court denied Altizer's petition for appeal because the trial court found the victim credible, a determination exclusively within the trial court's purview.

In 2010, the trial court denied Altizer's petition for a writ of habeas corpus.  Altizer then appealed to the Supreme Court of Virginia, which denied his habeas petition for appeal.

### C.  Altizer's Petition for Writ of Actual Innocence

On July 10, 2013, Altizer filed a petition for a writ of actual innocence.  In support of his petition, he offers three witnesses' affidavits which he claims to prove that J.Y. lied under oath at his trial and to describe J.Y.'s "scheme to defraud the court."

In the first affidavit, Dale E. Hunt ("Hunt's Affidavit") states that he overheard a group of boys, including J.Y., discussing the incident while he was smoking a cigarette in the road.  Hunt said that the boys were discussing how J.Y. became jealous of the other little boy Altizer and Uncle Jay were taking care of because he "took over his place."  J.Y. asked the other boys "what to do to get back at Jay and James [Altizer]."  Hunt says that the other boys said that the best way to get back at him was to say that Altizer touched him in the "wrong places."

Hunt previously worked with Uncle Jay and J.Y.'s father, Brandon Young, at Long John Silver's. Almost two to three months after hearing the boys' conversation, Hunt ran into Uncle Jay at Wal-Mart and Uncle Jay told him about Altizer "going to jail because some little boy named [A.Y.] had said things about him."  Hunt asked Uncle Jay if A.Y. also went by the name J.Y.  Hunt claims that he did not come forward until he discovered that J.Y. and A.Y. were the same person.  Hunt further states that J.Y.'s father, Brandon

Young, said that he was going to "get Jay back" for a situation at Long John Silver's where he was fired "even if it meant using his own kid, [J.Y.]."

In the second affidavit, Steven Thrasher ("Thrasher Affidavit") describes how Altizer was hard of hearing. Thrasher was Altizer's former co-worker; Thrasher would occasionally pick up Altizer for work. Thrasher said that Altizer could not hear him when he would honk the horn of his car or knock on the door. Altizer alleges that Thrasher's statement about his hearing loss contradicts J.Y.'s testimony about Altizer hearing a car door slam the night of the incident.

Finally, in the third affidavit Carolyn Bussey ("Bussey Affidavit") describes how she overheard J.Y. arguing with some other boys near her trailer. J.Y. told one of the other boys, "Do not fuck with me." Another boy said, "[J.Y.], you will have their mom or dad put in jail, won't you?" J.Y. said, "Yes I will, I had my Uncle Jay's faggot boyfriend put in jail and I will your mom or dad. My mom told me what to say to put him in jail." The affidavit does not specify the date of the argument; however, the affidavit itself was signed and sworn to under penalty of perjury on July 17, 2012.

Altizer argues that in considering the entire record in light of these three additional affidavits, no rational trier of fact would have found him guilty beyond a reasonable doubt and, therefore, this Court should grant him a writ of actual innocence based on nonbiological evidence.

## II. ANALYSIS

Code § 19.2-327.10 confers original jurisdiction upon this Court to consider a petition for a writ of actual innocence based on newly-discovered, non-biological evidence filed by any individual "convicted of a felony upon a plea of not guilty." A petition for a writ of actual innocence based on non-biological evidence must allege "categorically and with specificity":

> (i) the crime for which the petitioner was convicted or the offense for which the petitioner was adjudicated delinquent, and that such conviction or adjudication of delinquency was upon a plea of not guilty;
>
> (ii) that the petitioner is actually innocent of the crime for which he was convicted or the offense for which he was adjudicated delinquent;

-4-

(iii) an exact description of the previously unknown or unavailable evidence supporting the allegation of innocence;

(iv) that such evidence was previously unknown or unavailable to the petitioner or his trial attorney of record at the time the conviction or adjudication of delinquency became final in the circuit court;

(v) the date the previously unknown or unavailable evidence became known or available to the petitioner, and the circumstances under which it was discovered;

(vi) that the previously unknown or unavailable evidence is such as could not, by the exercise of diligence, have been discovered or obtained before the expiration of 21 days following entry of the final order of conviction or adjudication of delinquency by the circuit court;

(vii) the previously unknown or unavailable evidence is material and, when considered with all of the other evidence in the current record, will prove that no rational trier of fact would have found proof of guilt or delinquency beyond a reasonable doubt; and

(viii) the previously unknown or unavailable evidence is not merely cumulative, corroborative or collateral.

Code § 19.2-327.11(A)(i)-(viii). This Court may grant a petition "only upon a finding that the petitioner has proven by clear and convincing evidence all of the allegations contained in clauses (iv) through (viii) of subsection A of Code § 19.2-327.11, and upon a finding that no rational trier of fact would have found proof of guilt or delinquency beyond a reasonable doubt." Code § 19.2-327.13. Otherwise, this Court "shall [] dismiss the petition for failure to establish previously unknown or unavailable evidence sufficient to justify the issuance of the writ." Id.

Effective July 1, 2013, the General Assembly amended Code §§ 19.2-327.13 and 19.2-327.11(A)(vii) to read, "no rational trier of fact *would* have found proof of guilt beyond a reasonable doubt" instead of "no rational trier of fact *could* have found proof of guilt beyond a reasonable doubt." All existing caselaw was decided under the former "could" language of the actual innocence statute. Altizer's petition, filed July 10, 2013, presents the first opportunity for this Court to address the July 1, 2013 amendment. See Taylor v. Commonwealth, 44 Va. App. 179, 184, 604 S.E.2d 103, 105 (2004) ("'[T]he rights of the parties are to be deemed in accordance with the law in effect when the action is begun.'" (quoting Washington v.

-5-

Commonwealth, 216 Va. 185, 193, 217 S.E. 2d 815, 823 (1975))). Therefore, before resolving Altizer's petition, we must first determine as a matter of first impression the effect of the language change from "could" to "would" on this Court's determination.

When this Court construes statutes, it "assume[s] that the legislature's amendments to the law are purposeful and not unnecessary." Broadnax v. Commonwealth, 24 Va. App. 808, 814, 485 S.E.2d 666, 669 (1997). This Court "will not construe legislative action in a manner that would ascribe to the General Assembly a futile gesture." Shaw v. Commonwealth, 9 Va. App. 331, 334, 387 S.E.2d 792, 794 (1990). "Legislative amendments are presumed as intended to effect a change in the law." Id.; see also S. Ry. Co. v. U.S. Cas. Co., 136 Va. 475, 483, 118 S.E. 266, 269 (1923) ("An amendment to a statute should always be construed to mean something, rather than nothing."). Consequently, by changing a single word in the actual innocence statute, it is plain that the General Assembly intended for the change from "could" to would" to have *some* effect on the statutory burden required of the petitioner. The question this Court must resolve is *what* effect.

Our Supreme Court has repeatedly said that, "[w]hen interpreting and applying a statute, we 'assume that the General Assembly chose, with care, the words it used in enacting the statute, and we are bound by those words.'" Kiser v. A.W. Chesterton Co., 285 Va. 12, 19 n.2, 736 S.E.2d 910, 915 n.2 (2013) (quoting Halifax Corp. v. First Union Nat'l Bank, 262 Va. 91, 100, 546 S.E.2d 696, 702 (2001)). "It is well-settled that 'we determine the General Assembly's intent from the words contained in the statute.'" Va. Broad. Corp. v. Commonwealth, 286 Va. 239, 749 S.E.2d 313 (2013) (quoting Alger v. Commonwealth, 267 Va. 255, 259, 590 S.E.2d 563, 565 (2004)). "When a statute is unambiguous, we must apply the plain meaning of that language." Appalachian Power Co. v. State Corp. Comm'n, 284 Va. 695, 706, 733 S.E.2d 250, 256 (2012). "Therefore, when the language of an enactment is free from ambiguity, resort to legislative history and extrinsic facts is not permitted because we take the words as written to determine their meaning." Brown v. Lukhard, 229 Va. 316, 321, 330 S.E.2d 84, 87 (1985).

-6-

Conversely, where ambiguity exists, an examination of the statute's legislative history is permitted in order to determine its meaning. See Doulgerakis v. Commonwealth, 61 Va. App. 417, 421, 737 S.E.2d 40, 41 (2013). "A statute is ambiguous when its language is 'capable of more senses than one, difficult to comprehend or distinguish, of doubtful import, of doubtful or uncertain nature, of doubtful purport, open to various interpretations, or wanting clearness or definiteness,' particularly where its words 'have either no definite sense or else a double one.'" Va. Broad. Corp., 286 Va. at 249, 749 S.E.2d at 318-19 (quoting Ayres v. Harleysville Mut. Cas. Co., 172 Va. 383, 393, 2 S.E.2d 303, 307 (1939)).

Unfortunately, as both parties acknowledged at oral argument, this particular single word amendment is ambiguous in that it is subject to various contextual interpretations and does not clearly reflect the degree to which the General Assembly intended to modify our standard of review for these petitions. "Would," the past tense of "will," and "could," the past tense of "can," are modal auxiliary verbs, or "helping" verbs—meaning they are added to basic verbs to indicate mood or tense to add specific shades of meaning. See Mary Barnard Ray & Jill J. Ramsfield, Legal Writing: Getting It Right and Getting It Written, 452 (West 2010). Modal auxiliary verbs may express necessity, uncertainty, ability, or permission. They cannot be understood or defined in isolation, but rather obtain meaning from their context. "Would" can have multiple meanings depending on its context. For example, it may be used in an auxiliary function to express preference between alternatives if used with "rather," to express inclination,[1] to express a plan or intention,[2] in the conclusion of a conditional sentence to express volition or intention,[3] or to "express probability or presumption in past or present time."[4] See Webster's Third New International Dictionary 2637-38 (1993). Indeed, "would" and

---

[1] "He *would rather* die than face them." Webster's Third New International Dictionary 2638.

[2] "They decided they *would* visit as many friends as possible." Webster's Third New International Dictionary 2638.

[3] "If I were a librarian, I *would* put this book on my display." Webster's Third New International Dictionary 2638.

[4] "No one, for example, could have predicted whether or not his pistol *would* have missed fire." Webster's Third New International Dictionary 2638.

"could" are often used synonymously and interchangeably. <u>See</u> <u>id.</u> (listing "could" as a synonym for "would").

Consequently, the term "would" in the context of the phrase "no rational trier of fact *would* have found proof of guilt beyond a reasonable doubt," lacks definiteness and is open to various interpretations and is therefore speculative and ambiguous. Because "would" is ambiguous in the context of this statute, we therefore consider the meaning of the amendment in light of the canons of construction and its legislative history.

Altizer asserts, and the Commonwealth concedes, that the change from "no rational trier of fact *could* have found proof of guilt beyond a reasonable doubt" to "no rational trier of fact *would* have found proof of guilt beyond a reasonable doubt" provides, in theory, a more "lenient" standard for the petitioner. However, Altizer was unable or unwilling to suggest the manner or degree to which the standard of review had been liberalized and the Commonwealth suggested that while the standard was more lenient in theory, in practice it was essentially unchanged. In context, the use of the word "would" suggests likelihood or probability, while "could" suggests mere possibility. <u>See</u> Ray & Ramsfield, <u>supra</u>, at 452 (explaining that "*would* implies that an action would have been taken had conditions been different," and "*could* implies the capacity to do something, but suggests that the action will not or has not been done"). Therefore, under the "could" standard this Court could only grant a petition if there was *no possibility* of a finding of guilt when considering all of the evidence presented at trial and any newly-discovered admissible evidence. Thus, because "could" and "would" appear to reflect different degrees of probability, choosing to replace the word "could" with "would," in the context of this negative assertion, suggests that the General Assembly intended to broaden to some degree the circumstances under which this Court may grant a writ of actual innocence. However, neither Altizer nor the Commonwealth were able to articulate on brief or at oral argument an answer to the question of what evidentiary showing by a petitioner is required under the "would" standard in order for this Court to issue a writ of actual innocence.

-8-

"If [a] statute is subject to more than one interpretation, [this Court] must apply the interpretation that carries out the legislative intent." Appalachian Power Co., 284 Va. at 706, 733 S.E.2d at 256. The actual innocence statute "reflect[s] an obvious legislative purpose": to provide a mechanism other than a gubernatorial pardon, to provide relief to those who demonstrate that they are factually innocent of the crimes. Carpitcher v. Commonwealth, 273 Va. 335, 345, 641 S.E.2d 486, 492 (2007). However, "the General Assembly intended to provide relief only to those individuals who can establish that they did not, *as a matter of fact*, commit the crimes for which they were convicted." Id. (emphasis added). "The statutes governing writs of actual innocence based on non-biological evidence considered as a whole . . . *were not intended to provide relief to individuals who merely produce evidence contrary to the evidence presented at their criminal trial*." Id. (emphasis added); see also Haynesworth v. Commonwealth, 59 Va. App. 197, 223, 717 S.E.2d 817, 830 (2011) (Humphreys, J., dissenting) ("New evidence that merely raises doubt about the verdict or even second thoughts on the part of a prosecutor, are not legally sufficient to issue a writ and for such cases, executive clemency remains an available alternative.").

It is clear that in choosing such a nuanced change of a single word from "could" to "would," the General Assembly did not intend to alter the underlying purpose of the actual innocence statute. See Ambrogi v. Koontz, 224 Va. 381, 389, 297 S.E.2d 660, 664 (1982) ("[A] statute should, if possible, be given a reasonable construction which will effect rather than defeat a legislative purpose evident from the history of the legislation."). Nor do we conclude that the legislature intended to undermine or supplant the historical deference appellate courts give to the first-hand evaluation of the evidence by a trial court or jury. We assume that the General Assembly is aware that such historical deference is the result of recognition that a simple majority of appellate court judges, whose role is traditionally to analyze pure questions of law such as whether evidence is sufficient *as a matter of law* to sustain a conviction, are not in the best position to second guess from a sterile record the credibility and weight of the evidence assigned by a unanimous jury or judicial factfinder. See Haynesworth, 59 Va. App. at 223, 717 S.E.2d at 830 (Humphreys, J., dissenting) ("Because a trial is the historically preferred mechanism for testing the quality of evidence and determining guilt or

-9-

innocence, the statute governing our actions in these cases sets the bar deliberately high for any petitioner seeking a writ of actual innocence."); see also Haskins v. Commonwealth, 44 Va. App. 1, 11, 602 S.E.2d 402, 407 (2004) ("[T]he trial on the merits should be 'the main event . . . rather than a tryout on the road.'" (quoting Anderson v. Bessemer City, 407 U.S. 564 (1985))). Trial court judges and juries, who benefit from actually seeing and hearing the witnesses testify, have the ability appellate courts lack to observe tone and body language that are so important to the assignment of the credibility and weight to be given witness testimony. See Johnson v. Commonwealth, 273 Va. 315, 323, 641 S.E.2d 480, 485 (2007) ("As the trier of fact, the [trial] court is charged with the responsibility of considering various factors, including the witness' demeanor, his opportunity for knowing the things about which he has testified, his bias, and any prior inconsistent statements relating to the subject of his present testimony.").

Consequently, we must interpret the amendment from "could" to "would" in a manner consistent with the statute's purpose: "to provide relief only to those individuals who can establish that they did not, *as a matter of fact*, commit the crimes for which they were convicted." Carpitcher, 273 Va. at 345, 641 S.E.2d at 492 (emphasis added). Every writ of actual innocence petition requires an individualized review by this Court of the record in light of newly-discovered evidence, and we conclude that the single word amendment by the General Assembly was nuanced in nature and did not produce a sea-change in the manner in which these petitions are to be evaluated by this Court. In short, we conclude that the amendment did not alter our Supreme Court's holding in Carpitcher that any newly-discovered evidence must be material to a factual conclusion regarding the elements of the offense(s) for which the petitioner was convicted, rather than merely the credibility of the witnesses. Therefore, we hold that in the wake of the amendment, a finding by this Court that "no rational trier of fact *would* have found proof of guilt beyond a reasonable doubt" unequivocally continues to require a finding by this Court that a petitioner has affirmatively established that he is *factually innocent* of the crime for which he was convicted and that the statute as amended mandates that our standard of review for granting these petitions and issuing a writ of actual innocence is that, if provided with all of the evidence, both old and new, *any* reasonable jury applying the relevant law is obliged to conclude as much.

-10-

Thus, we hold that newly-discovered evidence that merely casts some measure of doubt on the original verdict and judgment remains an insufficient basis to grant a writ of actual innocence.

Applying this holding to the present case, we need not address whether Altizer has met the other requirements of the actual innocence statute because he has failed to offer any evidence that he is factually innocent. Here, the three witnesses' affidavits, even if certified by the trial court as true, only serve to challenge the victim's veracity. Even if the evidence contained in the affidavits was available and presented at trial, its only permissible use would be to impeach the credibility of the victim's trial testimony.[5] In addition, the affidavits do not even establish, as Altizer claims, that J.Y. lied under oath. Newly-discovered evidence that serves to merely impeach the credibility of unrecanted witness testimony may not serve as a basis for a writ of actual innocence.

While the affidavits might provide a possible motive for the victim to lie, or undermine details of the incident the victim recounted at trial, they do not prove that Altizer did not sodomize J.Y. on December 28, 2007, and therefore it is impossible as a matter of law for this Court to conclude that "no rational trier of fact would have found proof of guilt beyond a reasonable doubt."

### III. CONCLUSION

In sum, we hold that Altizer has failed to carry his statutory burden of offering evidence that if produced at trial, "no rational trier of fact would have found proof of guilt beyond a reasonable doubt," and therefore it is unnecessary to remand for further factual development by the trial court. Accordingly, pursuant to Code § 19.2-327.13(i) we "dismiss the petition for failure to establish previously unknown or unavailable

---

[5] Moreover, to be entitled to the issuance of a writ of actual innocence pursuant to Code § 19.2-327.13, the petitioner must prove by clear and convincing evidence that "the previously unknown or unavailable evidence is not merely cumulative, corroborative or collateral." Code § 19.2-327.11(A)(viii); see, e.g., In re Barron, 44 Va. App. 536, 539, 605 S.E.2d 777, 779 (2004) (finding that the petition was not eligible for a writ of actual innocence based upon evidence that merely corroborated the Commonwealth's evidence and did not otherwise prove he was innocent of the charged offenses). Because the evidence that Altizer proffers in support of his petition does not tend to prove or disprove whether he is guilty of the crime for which he was convicted, arguably, that evidence is collateral to his factual innocence. See, e.g., In re Lima, 44 Va. App. 571, 572, 605 S.E.2d 794, 795 (2004) (holding that the petitioner's better understanding of the English language and the American judicial system was not evidence proving or disproving any fact in issue as to whether he committed the crimes for which he was convicted).

-11-

evidence sufficient to justify the issuance of the writ." The Attorney General shall recover of the petitioner his costs expended herein.

This order shall be published.

Attorney General's Costs:

Attorney's fee          $50.00

A Copy,

Teste:

*original order signed by the Clerk of the Court of Appeals of Virginia at the direction of the Court*

Clerk