PUBLISHED

## VIRGINIA:

*In the Court of Appeals of Virginia on* **Tuesday** *the* **4th** *day of* **December, 2018**.

Darnell Phillips,                                                                                            Petitioner,

 against              Record No. 0788-18-1

Commonwealth of Virginia,                                                                      Respondent.

Upon a Petition for a Writ of Actual Innocence

Before Judges Beales, O'Brien, and Malveaux

Jennifer L. Givens (Innocence Project Clinic, University of Virginia School of Law, on briefs), for petitioner.

Matthew P. Dullaghan, Senior Assistant Attorney General (Mark R. Herring, Attorney General, on brief), for respondent.

Darnell Phillips ("petitioner") filed with this Court a Petition for a Writ of Actual Innocence Based on Nonbiological Evidence pursuant to the provisions of Chapter 19.3 of Title 19.2 of the Code of Virginia. Petitioner contends he is innocent of abduction with intent to defile, forcible sodomy, rape, and malicious wounding – the offenses for which he was convicted by a jury in the Circuit Court of the City of Virginia Beach on June 12, 1991. In support of this contention, petitioner argues that previously unknown or unavailable DNA evidence and a "recantation from the victim" demonstrate he was wrongfully convicted.

### I.        BACKGROUND AND PROCEDURAL HISTORY

On the afternoon of August 8, 1990, the victim, a ten-year-old girl, was riding her bicycle around a park in a neighborhood in Virginia Beach. She was approached by a man who pushed her off of her bicycle and down a hill. After threatening to kill her if she screamed, he violently removed her shorts and underwear, then proceeded to rape and sexually assault her. After the sexual assault, the man punched her in the face approximately five times with his fist. As the victim began to lose consciousness, he picked her up, shoved her into a nearby creek, and then fled. The victim woke up in the water, picked up her clothes, got out of the

water, retrieved her bicycle, and ran until she encountered some women who helped her and also contacted the authorities.

At the hospital later that evening, the victim said to the investigating police officer that her attacker was an African-American male, approximately 6 feet tall, "heavy build, and out of shape." She told the officer that her attacker had a gold tooth on the left side of his mouth, and "a black rain type hat with a wide brim and that it had an emblem on the front" which she believed was red. Shortly thereafter, police came across petitioner – approximately half a mile from the scene of the attack – holding a Chicago Bulls hat. Later in their investigation, the police again found petitioner wearing a Chicago Bulls hat that the victim subsequently identified as the one worn by her attacker. Noticing a similarity between petitioner and a composite sketch drawn at the direction of the victim, police obtained and executed search warrants for petitioner's person and residence and took him into custody. While in police custody, petitioner signed an Advisement of Rights form that waived his Miranda rights. Detective Sean Hoffman of the Virginia Beach Police Department testified at trial that petitioner subsequently confessed to Hoffman that he committed the attack.

On June 12, 1991, a jury found petitioner guilty of malicious wounding, abduction with intent to defile, forcible sodomy, and rape. He subsequently filed an appeal with the Court of Appeals, which this Court granted and, after oral argument, affirmed the conviction on November 2, 1993.

On May 22, 2000, the Virginia Beach Circuit Court ordered DNA testing of the hairs recovered as evidence and admitted during trial as Commonwealth's Trial Exhibit 21.[1] In a letter dated August 24, 2001, the Armed Forces Institute of Pathology concluded that the DNA sequence of the hair it tested from Exhibit 21 was not consistent with the DNA sequence of a sample obtained from petitioner. Based on that finding, petitioner submitted a petition for a writ of actual innocence to the Supreme Court on December 16, 2004, which was dismissed on procedural grounds on January 13, 2005.

---

[1] At trial, the Commonwealth introduced testimony by an expert witness opining that one of the hairs from Exhibit 21 "could have originated" from petitioner.

On February 23, 2005, petitioner filed a motion with the Virginia Beach Circuit Court requesting testing of any newly discovered or previously untested physical evidence. On October 19, 2005, the circuit court ordered that all biological evidence seized by the Virginia Beach Police Department in the case be tested for DNA. In a letter dated November 22, 2005, the Office of the Commonwealth's Attorney of Virginia Beach informed the circuit court that it had no evidence from the case remaining in custody as it had been previously destroyed. The circuit court consequently then vacated its October 19, 2005 order for testing of biological evidence.

In October 2015, subsequent to the filing of a Freedom of Information Act request, some physical evidence from the case was discovered not to have been destroyed. On March 7, 2016, pursuant to a motion from petitioner, the Virginia Beach Circuit Court ordered testing of the physical evidence by the Virginia Department of Forensic Science (DFS). In a letter dated June 7, 2016, DFS reported that it identified no spermatozoa in its testing of smear samples taken from the victim's person and no DNA profile foreign to the victim in its testing of swabs from the victim's person. Upon a further order from the circuit court, the physical evidence was subsequently tested by Forensic Analytical Sciences (FAS), which reported on January 4, 2017 that "no sperm or other evidence of semen and no male DNA was detected from any of the samples tested at FAS." Upon another order from the circuit court, the physical evidence was tested by Serological Research Institute (SERI). On August 31, 2017, SERI reported discovering the following – (1) from the  stain cuttings from the sheet on which the victim was placed, [2] the stain cuttings from the victim's shorts, and stain cuttings from the victim's shirt, no semen was found and from one of the cuttings from the victim's underwear, "only one sperm cell was microscopically identified," about which no further identifying information was provided; (2) from the exterior surface of the victim's black shorts' waistband, buttocks, and crotch area, a "weak and incomplete mixture of at least two males," excluding petitioner as a

---

[2] Detective Kurrle testified that, when the victim was moved from the ambulance gurney to the bed at the hospital, he noticed a stain on the sheet that had been underneath her. He took the sheet and placed it in a plastic bag to secure as possible evidence.

contributor; (3) from the interior crotch of the victim's underwear, male DNA in which "Darnell Phillips (and any paternal relative) is <u>included</u> as a possible contributor"[3] (emphasis in original quote); (4) from the exterior surface of the victim's underwear, a mixture of at least four people, including at least one male and one female contributor, excluding petitioner as a contributor; and (5) from the exterior surface of the victim's underwear, a mixture of at least four males, excluding petitioner as a contributor.[4]

---

[3] SERI reports that "approximately one in every 23 males from the general population would be similarly included as a possible contributor." Petitioner also claims in his petition – without citing to the SERI Report or to any other report – that one in 10 men in the African-American population could be a possible contributor.

[4] The conclusions of the SERI Report read as follows:

1. No semen or saliva were detected on any of the sheet stain cuttings (items 2-1 through 2-8), the short stain cuttings (items 4-1 through 4-5), or the shirt stain cuttings (items 7-1 through 7-6). Saliva but no semen was detected on the combined swab samples (items 1B-1G, 1B-1H, and 1B-2E). A trace amount of semen, but no saliva, was detected on one of the underwear cuttings (item 6-1). Although, only one sperm cell was microscopically identified in this sample. No semen or saliva was detected on the other underwear cutting (item 6-2).
2. Male DNA recovered from the exterior surface of the black short's waistband, buttocks and crotch area M-Vac® sample (item 4-7) is a weak and incomplete mixture of at least two males. Darnell Phillips is excluded as a contributor to the mixture.
3. Male DNA recovered from the epithelial cell fraction of the underwear's interior crotch M-Vac® sample (item 6-3) gave weak and incomplete results. Darnell Phillips (and any paternal relative) is <u>included</u> as a possible contributor. Using a 95% upper bound confidence interval, approximately one in every 23 males from the general population would be similarly included as a possible contributor. No detectable male DNA was recovered from the sperm cell fraction of the underwear's interior crotch M-Vac® sample (item 6-3).
4. DNA recovered from the M-Vac® sample of the exterior surface of the purple underwear's waistband, buttocks, and crotch area (item 6-4) is a mixture from at least four people including a discernable major portion and at least one male and one female donor. [Victim] is included as a minor contributor to the mixture, which is not unexpected given the source of the sample. Darnell Phillips is excluded as a contributor to the mixture.
5. Male DNA recovered from the M-Vac® sample of the exterior surface of the purple underwear's waistband, buttocks, and crotch area (item 6-4) is a mixture of at least four males including a discernable major portion. Darnell Phillips is excluded as a contributor to the mixture.

Serological Research Institute (SERI) Analytical Report, pages 9-10. (Emphasis in original.)

On September 12, 2017, after discussing the case and DNA results with an attorney from the Innocence Project at the University of Virginia School of Law, the victim signed a declaration reaffirming that she was "brutally raped and beaten by a man" when she was ten years old, but that she "could have identified the wrong man as [her] attacker."

On May 15, 2018, petitioner filed the petition for a writ of actual innocence that is the subject of this order, contending that the "recantation of the victim" and DNA test results constitute previously unknown or unavailable evidence which is material and which, when considered with all the other evidence in the record, prove that no rational trier of fact would have found proof of guilt beyond a reasonable doubt. On June 1, 2018, this Court directed the Attorney General to respond to the petition, which response was received on July 31, 2018. Petitioner then filed a reply to the Attorney General's Motion to Dismiss with the Court on August 17, 2018, and oral argument on the petition occurred on October 30, 2018.

## II.     ANALYSIS

"Code § 19.2-327.10 confers original jurisdiction upon this Court to consider a petition for a writ of actual innocence based on non-biological evidence." Bush v. Commonwealth, 68 Va. App. 797, 803, 813 S.E.2d 582, 585 (2018). "Human biological evidence may not be used as the sole basis for seeking relief under this writ but may be used in conjunction with other evidence." Code § 19.2-327.11(A). "The burden of proof in a proceeding brought pursuant to this chapter shall be upon the convicted or delinquent person seeking relief." Code § 19.2-327.13.

This Court may grant a writ of actual innocence "only upon a finding that the petitioner has proven by clear and convincing evidence all of the allegations contained in clauses (iv) through (viii) of subsection A of [Code] § 19.2-327.11, and upon a finding that no rational trier of fact would have found proof of guilt or delinquency beyond a reasonable doubt[.]" Code § 19.2-327.13(ii). The evidence upon which the petitioner relies must be "material, and . . . when considered with all of the other evidence in the current record, will prove that no rational trier of fact would have found proof of guilt beyond a reasonable doubt." Bush, 68 Va. App. at 805-06, 813 S.E.2d at 586.

-5-

"[T]o be 'material,' within the meaning of Code § 19.2-327.11(A)(vii), evidence supporting a petition for a writ of actual innocence based on non-biological evidence must be true." Carpitcher v. Commonwealth, 273 Va. 335, 345, 641 S.E.2d 486, 492 (2007). "[N]ewly-discovered evidence that merely casts some measure of doubt on the original verdict and judgment remains an insufficient basis to grant a writ of actual innocence." Altizer v. Commonwealth, 63 Va. App. 317, 328, 757 S.E.2d 565, 570 (2014). A petitioner must "affirmatively establish[ ] that he is *factually innocent* of the crime for which he was convicted . . . ." Id. (Emphasis in original.)

"[A] petitioner's evidence 'must establish such a high probability of acquittal, that this Court is reasonably certain that no rational fact finder would have found him guilty.'" Bush, 68 Va. App. at 809, 813 S.E.2d at 587-88 (quoting In re Watford, 295 Va. 114, 124, 809 S.E.2d 651, 657 (2018)). "The actual-innocence statutes require us to take all of the factual information, which is reviewed in its totality, and to test it under the clear-and-convincing standard." In re Brown, 295 Va. 202, 229, 810 S.E.2d 444, 459 (2018). "In other words, the statute effectively requires us to draw our conclusion from a hypothetical new trial in which a rational factfinder hears all of the evidence in the aggregate . . . ." Id. (quoting In re Watford, 295 Va. at 125, 809 S.E.2d at 657).

### A. The Victim's "Declaration"

Petitioner argues that the victim's September 12, 2017 Declaration, which petitioner characterizes as a "recantation," demonstrates his innocence. In her Declaration, the victim states, "It is not surprising me that I could have identified the wrong man as my attacker." She states, "I was attacked by a black man near the creek and the bridge in the park" – and that he was "wearing a white shirt with numbers on it, and a Chicago Bulls cap." However, she also casts doubt on her identification of petitioner when stating that "the only reason I identified Darnell as my attacker was because of what the police told me about him and their investigation." She also says, "I was never sure about anyone in those pictures. To be honest, I could hardly tell one man from the next. I was really confused. When they came to my house one night and woke me up, I knew that they weren't going to stop until I identified someone."

-6-

As an initial matter, we reject petitioner's characterization of the victim's Declaration as "a recantation." The victim adamantly still maintains that she was brutally raped and beaten in the park by an African-American man when she was ten years old. Although the victim does cast doubt on her identification of petitioner – now saying she "could have identified the wrong man" – she does not actually state now that petitioner was *not* her attacker.

The circumstances of the victim's Declaration, of course, affect our evaluation of that document in our overall analysis. First is the great length of time – more than a quarter of a century – that has passed from the victim's initial identification of petitioner, both to the police and in court. The Supreme Court has said:

> Traditionally, courts view recantations with "great suspicion." "Skepticism about recantations is especially applicable in cases of child sexual abuse where recantation is a recurring phenomenon." We have observed: "Recantation evidence is generally questionable in character and is widely viewed by courts with suspicion because of the obvious opportunities and temptations for fraud. Unless proven true, recantation evidence merely amounts to an attack on a witness' credibility by the witness herself."
> Such skepticism increases with the passage of time. Recantation evidence appearing long after the trial has ended places the opposing party at a disadvantage similar to that which justifies statutes of limitations. Memories have faded, witnesses may have disappeared or become incapable of testifying, physical evidence may be unrecoverable . . . .

Haas v. Commonwealth, 283 Va. 284, 292, 721 S.E.2d 479, 482 (2012) (footnote omitted) (citation omitted) (first quoting Dobbert v. Wainwright, 468 U.S. 1231, 1233-34 (1984); then quoting United States v. Provost, 969 F.2d 617, 621 (8th Cir. 1992); and then quoting Carpitcher, 273 Va. at 346, 641 S.E.2d at 492). Virtually all of the concerns and detracting factors pointed to by the Supreme Court in Haas are present here. The victim was 10 years old when she was attacked and, furthermore, the victim's Declaration now relied upon by petitioner was provided 26 years after the victim testified in court.

The second factor is that it is not apparent exactly what information was or was not presented to the victim concerning the DNA test results. The victim's Declaration, which petitioner's counsel at oral argument acknowledged was drafted by one of petitioner's counsel, certainly appears to indicate a heavy

reliance on the purported lack of petitioner's DNA as a major reason that the victim now feels that she "could have identified the wrong man as [her] attacker." Particularly of note, in the Declaration, the victim states:

> Deirdre Enright recently came to Georgia to talk to me about this case. She told me about the recent DNA test results. According to Deirdre, they found the touch DNA of several men on my shorts, which my attacker pulled off me. Darnell Phillip's DNA was not found on my shorts.

Notably absent from the Declaration is any acknowledgment or understanding that, as the SERI Report states, "Darnell Phillips (and any paternal relative) is included as a possible contributor" to the DNA found on the inside of the victim's underwear. (Emphasis in original quote.) Therefore, as discussed *supra*, the DNA testing, even by SERI, was not conclusive and did not actually exonerate petitioner. Indeed, at oral argument before this Court, petitioner's counsel could not tell the Court whether the fact that SERI reported that the DNA found on the victim's underwear included petitioner as a possible contributor was actually ever explicitly *told* to the victim – other than in providing her with the overall (and highly technical) SERI Report. Counsel stated that the victim "was given all of the information. I believe she was given the report – the SERI Report – so she was given all of the information." The Court appreciates counsel's candor.

Given all of these factors, we conclude that the victim's 2017 Declaration is not a recantation and, in any event, is not sufficient to so discredit the victim's original in-court identification of petitioner at trial such that no rational factfinder would find petitioner guilty.

### B. DNA Testing

Scientific analysis conducted by DFS[5] found no spermatozoa in any of the samples that it tested from the victim's person. In fact, in many of the samples tested by DFS, no DNA profile foreign to the victim was detected. In short, the fact that DFS did not detect any male DNA on the physical evidence that was found in 2015 certainly does not exonerate petitioner. It is undisputed that a male attacked and brutally raped the victim, removing her clothing in the attack, so the fact that the DFS testing was unable to detect any male

---

[5] Pursuant to Code § 19.2-327.1, DFS is expressly authorized to conduct such analysis upon order by the circuit court.

-8-

DNA does not exonerate petitioner any more than it exonerates all other males. Attempting to test this evidence a quarter of a century after it was collected apparently presented challenges.

The parties take opposing positions concerning this Court's ability to consider scientific analysis performed by entities other than DFS (specifically by SERI in this case), in light of In re Brown, 295 Va. 202, 810 S.E.2d 444 (2018), decided earlier this year. In that case, after reviewing Code § 19.2-327.1, the statute which provides authority for testing of newly discovered or previously untested scientific evidence, the Supreme Court concluded, "We have no authority to go outside the boundaries of the statutory scheme to grant a writ of actual innocence based on test results uncertified by DFS." Id. at 224, 810 S.E.2d at 456. The Commonwealth argued on brief and at oral argument that the Supreme Court's reasoning and holding in Brown apply to this Court and that DFS has been selected by the General Assembly as gatekeeper of the scientific analysis permitted under Code § 19.2-327.1. In opposition, petitioner argues that in Brown, "the Virginia Supreme Court relied exclusively on the statutory interplay of clauses contained in the DNA testing statute ([§]19.2-327.1) and the actual innocence based on biological evidence statute ([§]19.2-327.3). There is simply no reference to, or reliance on, the statute addressing actual innocence petitions based on *nonbiological* evidence." (Citation omitted.) (Emphasis in original quote.)

We need not resolve the question here. Assuming without deciding that the Supreme Court's decision in Brown would still allow us to consider the DNA test results from SERI, those test results do not exonerate petitioner. The SERI Report's finding, which excluded petitioner as a contributor to samples from certain parts of the victim's clothing and other evidence tested, nevertheless, in other samples from different parts of the victim's clothing that were also tested, "included [petitioner] as a possible contributor." (Emphasis in original quote.)

### C. Review of the Totality of the Evidence

In considering this petition for a writ of actual innocence, as already noted *supra*, this Court is to consider all of the evidence in the aggregate and to grant the writ if we determine that no rational factfinder would have found petitioner guilty beyond a reasonable doubt. See Code § 19.2-327.13; In re Watford, 295

Va. 114, 809 S.E.2d 651 (2018); Bush v. Commonwealth, 68 Va. App. 797, 813 S.E.2d 582 (2018). There is much evidence that remains in place and remains unaffected by the evidence raised in this petition for a writ of actual innocence.

Petitioner confessed to committing the attack, describing the attack in detail to Detective Hoffman. In his confession, petitioner described how he pushed the victim off of her bicycle, how he struck the victim's face multiple times with his fist, and how he pushed the victim into a creek after raping her – descriptions consistent with the victim's own testimony about the attack, which she actually does not change in her 2017 Declaration. Petitioner went to great lengths (at trial, on appeal, and in this actual innocence proceeding both in his petition and at oral argument) to cast doubt on his "alleged confession." However, this line of argument concerning the validity of his confession was brought before this Court as an assignment of error on appeal of petitioner's conviction in 1992,[6] and was rejected by this Court in its decision affirming the conviction in 1993. See Phillips v. Commonwealth, No. 0087-92-1, 1993 Va. App. LEXIS 523 (Nov. 2, 1993). Although petitioner now seeks to attack Detective Hoffman's credibility by including exhibits pertaining to more recent actions by and allegations against Detective Hoffman, nothing now alleged by petitioner against Detective Hoffman has any direct bearing on this particular confession that petitioner made to the Detective. These new exhibits are about Detective Hoffman, his personal life, and allegations regarding his character generally, and have nothing specifically to do with this case and the confession that Detective Hoffman testified petitioner made to him back in 1990. In addition, petitioner argues that "Detective Hoffman had no notes of his alleged confession and no record of this confession beyond his own memory[.]" However, Detective Hoffman testified that he did actually make notes shortly after the interview. Indeed, the extensive, three-page August 16, 1990 memo from Detective Hoffman to Detective Kurrle that is apparently derived from his notes about petitioner's confession is included as an exhibit to the Commonwealth's Motion to Dismiss the Petition.

---

[6] In his petition for appeal filed in 1992, petitioner's first question presented was "Whether the trial court committed reversible error in failing to suppress Appellant's alleged confession?"

There is also highly relevant and persuasive evidence besides the confession. According to the police investigative report, in the victim's very first statement to the officer who saw her in the hospital emergency room within a short time of her being attacked, she described her attacker as "a black male" and "as having a black rain type hat with a wide brim and that it had an emblem on the front. . . . [He] had a gold tooth, and that it was not in the front of his mouth, but was on the left side." She also noted that he "wore a white t-shirt, baseball type and that it had green letters on it." Petitioner conceded in his testimony at trial that he had a gold tooth on the left side of his mouth. Furthermore, on at least two occasions shortly after the attack, he was seen by police officers with a black wide brim hat with a Chicago Bulls emblem. In addition, petitioner was within approximately half a mile of the site of the attack within two hours of the attack when the police came upon him, and he conceded both at trial and at oral argument before this Court, through his lawyer, that he had been in the park around the time the victim was attacked. When a search warrant was executed at petitioner's house, Detective Kurrle discovered men's underwear "wet and balled up in a ball" in a laundry basket or clothes hamper – just as petitioner had told Detective Hoffman in his confession, hours before, that he would find them. Detective Kurrle testified that the underwear was the only wet item in the hamper. Petitioner also provided physical descriptions of the victim to both Detective Kurrle and Detective Hoffman in separate interviews. When asked by Detective Kurrle why the victim would have picked him as her assailant, petitioner responded that the "fat little girl" may have seen him when he was in the park that day, when no one at that point apparently had given petitioner a description of the victim.

Considering all of this evidence in its totality, even taking into account the victim's 2017 Declaration and the newly discovered DNA evidence from SERI, assuming without deciding that we can even consider it under the Supreme Court's decision in Brown, we certainly cannot say that *no* rational factfinder would have found petitioner guilty beyond a reasonable doubt of the four crimes for which he was convicted.

### III. CONCLUSION

The victim's 2017 Declaration, in which she now states that she could have identified the wrong man as her rapist, while certainly relevant, is not a recantation and must be considered in light of the fact that it

-11-

comes more than a quarter of a century after the attack on her and the testimony at petitioner's trial that is now questioned in this petition. Furthermore, even assuming without deciding that we may consider the DNA testing results from SERI in light of <u>Brown</u>, the SERI Report's results on the DNA do not exonerate petitioner, as the third finding of the SERI Report states, "Darnell Phillips (and any paternal relative) is <u>included</u> as a possible contributor." (Emphasis in original quote.) Considering the whole record as it currently stands, there remains a confession by petitioner which (although it has been repeatedly attacked by petitioner) a factfinder at trial could certainly believe. The victim still adamantly maintains that her attacker was an African-American male who was wearing a Chicago Bulls cap, which petitioner was seen carrying in his hand within two hours of the attack and approximately half a mile from the park where the rape occurred. Petitioner admitted that he was in the park around the time of the attack. Finally, petitioner had a gold tooth on the left side of his mouth as the victim told police in the hospital emergency room shortly after the attack. For all of these reasons, we cannot find that *no* rational factfinder would have found proof of guilt beyond a reasonable doubt, which is the standard petitioner must persuade us to reach in order to grant the writ.

Accordingly, Darnell Phillips is not entitled to the writ, and his petition is dismissed.

This order shall be published.

A Copy,
      Teste:

Cynthia L. McCoy, Clerk
*original order signed by a deputy clerk of the*
By:    *Court of Appeals of Virginia at the direction*
      *of the Court*
Deputy Clerk