## VIRGINIA:

PUBLISHED

*In the Court of Appeals of Virginia on* **Tuesday** *the* **24th** *day of* **March, 2020**.

James Lamont Madison,                                                                 Petitioner,

 against              Record No. 0942-18-1

Commonwealth of Virginia,                                                        Respondent.

Upon a Petition for a Writ of Actual Innocence

Before Judges Russell, Malveaux, and Senior Judge Clements

Jennifer L. Givens (Innocence Project at the University of Virginia School of Law, on briefs), for petitioner.

Alphonso Simon, Jr., Assistant Attorney General (Mark R. Herring, Attorney General, on briefs), for respondent.

James Lamont Madison petitions this Court for a Writ of Actual Innocence pursuant to Chapter 19.3 of Title 19.2 of the Code of Virginia. Madison claims he is innocent of abduction, robbery, and the use of a firearm in the commission of a felony, for which he was convicted following a bench trial on October 1, 1997 in the Circuit Court of the City of Virginia Beach. This Court remanded the matter to the circuit court to certify findings regarding factual issues in dispute. The circuit court conducted an evidentiary hearing and supplied this Court with its certified findings of fact. After reviewing the record, we hold that Madison is not entitled to the writ. Therefore, we dismiss Madison's petition.

BACKGROUND

Evidence Presented at Trial

Madison's bench trial was held on October 1, 1997. Kevin Harris testified that on January 12, 1997, he was alone at his apartment in Virginia Beach. His doorbell rang several times, and Harris eventually opened his door and saw a neighbor and another man he did not know (the "first assailant"). Harris was not

"good friends" with his neighbor and did not know his neighbor's name. His neighbor lived on the second floor of the two-story building.

Harris testified that his neighbor and the first assailant asked him if he knew a woman named Trina, and that he told them he did but that she did not live there. After that, Harris' neighbor asked to use the phone, and Harris let him enter the apartment. The first assailant entered with the neighbor. After Harris' neighbor made a phone call, the first assailant asked to use the bathroom. After the man came out of the bathroom he moved toward the door, and then a second man unknown to Harris (the "second assailant") entered the apartment, pulled out a gun, and put it to Harris' temple. The second assailant asked Harris where his cocaine was, and Harris told him that he did not have any and that he had the wrong house. The man hit Harris in the eye with his gun, "put" him on the couch, and stood by him. The second assailant then "put" Harris on the floor, held the gun to his head, and asked Harris if the gold chain on his neck was "real." Harris told him that it was, and the man took it. Harris' neighbor and the first assailant were near the door at this time. The two assailants started asking Harris' neighbor about a safe, and then the first assailant hit the neighbor with a gun. The neighbor stated that he had a safe. At that point, Harris was tied up with a jacket and dragged into his bathroom. While in the bathroom, Harris heard footsteps and running throughout the apartment. He also heard someone say that four men were coming. He then heard his doorbell ring and his brother calling his name. Harris' brother and a couple of friends came to untie him. Harris then went to another neighbor's house and called 911. After the assailants left, Harris saw that his townhome was "ransacked." He discovered that he was missing two leather coats, that his roommate was missing one leather coat, and that some of his brother's money was missing.

At trial, Harris identified Madison as the second assailant who had committed the robbery. He testified that he recognized Madison due to several distinctive features: Madison's slim face, his skin tone, and his four gold teeth on the top of his mouth.[1] Harris testified that Madison's face was not covered during

---

[1] The police report from the robbery indicates that Harris identified both assailants as black.

the incident. He also noted that Madison had been wearing a black and tan or gray parka jacket during the robbery.

Detective John Gandy of the Virginia Beach Police Department investigated the robbery. On February 6, 1997, he showed Harris a photo lineup and Harris identified Madison as a person who had been involved in the robbery. Harris also testified that Detective Gandy had not indicated to him, either verbally or non-verbally, which suspect to choose from the lineup.

By the time of trial, Harris had learned the name of his neighbor, Joseph Barton, who had been present during the robbery. However, he had not seen Barton since the night of the robbery.

Detective Gandy testified that prior to showing Harris the photo lineup, he told Harris to take his time looking at the photos. Gandy testified that Harris had taken less than a minute to identify Madison as the person who had robbed him.

Detective Gandy arrested Madison at the jail in Norfolk where Madison was awaiting trial on charges stemming from offenses pending in Norfolk. After being served with the arrest warrants, Madison told the detective, "I don't know why you just got me. There is other people in this. Why just me?" Detective Gandy asked what Madison meant, and Madison replied that he was just talking to himself. Counsel for Madison asked Gandy if Madison's statement was solely in reference to a Norfolk case. Gandy responded, "No. I made it clear to him this is charges in Virginia Beach." However, Gandy later acknowledged that he was unsure whether Madison had been referring to people involved in the Norfolk charges when he made his statement.

Detective Gandy testified that no fingerprints from Madison were recovered from the apartment.

At trial, counsel for Madison asked Detective Gandy several questions regarding the involvement of Barton, Harris' neighbor, in his investigation. Detective Gandy testified that Barton "didn't want to cooperate with th[e] investigation." He also testified that he had shown Barton the same photo lineup viewed by Harris, but that Barton had been unable to identify anyone from the lineup.

Madison was found guilty of abduction, robbery, and use of a firearm in the commission of a felony. He was sentenced to five years' imprisonment on the abduction charge, twenty years' imprisonment on the robbery charge, and three years' imprisonment on the charge of use of a firearm in the commission of a felony, with thirteen years in total suspended. A sentencing order reflecting the conviction and sentence was entered on November 19, 1997.

The Police Investigation

After Madison filed his petition for writ of actual innocence, the Commonwealth provided an affidavit from Detective Gandy and copies of his investigative report from the time of the offense.

In his November 14, 2018 affidavit, Gandy stated that he did not specifically recall how Madison had been developed as a suspect in the robbery. However, Gandy recalled that he might have been given Madison's information by Norfolk investigators who had indications that Madison was a suspect in a similar home invasion/robbery, based upon his description—"short in stature and having 4 gold teeth in the front of his mouth." When Gandy located Madison at the jail, he had noted that Madison had multiple gold front teeth and was 5'6" in height or slightly taller.

Further, Gandy stated that he would have used the same procedure for showing Harris the photo lineup that he used in all of his cases. Gandy stated that he "would have" advised Harris that he would show him several photos and that the person involved in the robbery might or might not be in the photo lineup. Gandy noted that after Harris had been presented with the photo lineup, he had "almost immediately" selected Madison as the person who had struck him with a gun during the robbery. Detective Gandy stated that he did not "attempt to influence, coach or lead Mr. Harris into making the identification."

The investigative report also indicates that while Barton was "not cooperative" during the investigation, Gandy was able to interview him once after the robbery.[2] Barton told him that on the night of

---

[2] It is not clear from the report when this interview occurred, but Gandy does note that it happened after he sent a pager message to Barton on January 17, 1997, five days after the robbery.

the robbery, he had fallen asleep on a couch at his friend Adam Fatjo's apartment.[3]  Barton stated that he had heard someone knocking on the door, and that when he answered it, he had noticed two black men walking down the steps into the parking lot toward a large gray vehicle with four other individuals inside.  Barton said that the two men had gotten into the car but kept watching him.  He tried to leave the apartment, but as he did so one of the individuals got out of the car and met him at the foot of the stairs (the "first assailant").  The first assailant asked Barton if he knew a woman named Trina.  Barton said he did not and that she might live in another apartment.   Barton began to walk back to his residence, which was on the same street, but the first assailant followed him and kept asking him about Trina.  Because Barton was scared, he walked over to Harris' apartment.  The first assailant followed him, and when Barton knocked on Harris' door, Harris let both Barton and the first assailant inside.

Once inside, the first assailant asked Harris if he knew a woman named Trina, and Harris said that he did not.  Barton then stated that he used a pager to contact Adam Fatjo, but Fatjo never called him back.  The first assailant asked to use the bathroom, at which time Barton tried to leave.  However, when Barton opened the door, the second black man whom he initially saw walking down the steps with the first assailant (the "second assailant") was standing on the porch, so Barton went back into Harris' apartment.  The first assailant left the bathroom and walked toward the door, but then turned around and pulled a gun from his waistband.  Barton stated that the gun had appeared to be a dark-colored 9 millimeter with a silencer.  The first assailant demanded that Harris tell him "where the money's at."  The second assailant then threw Barton against a wall at gunpoint and took his diamond-studded earring and gold necklace.  Barton stated that the first assailant had then called four other men into the apartment and that then all six individuals took Barton back to Fatjo's apartment.  They asked Barton where the safe and guns were located.  Barton was then tied up with a shirt while one of the individuals put a gun to his head and asked him where the money was located.  The men

---

[3] When Detective Gandy interviewed Fatjo, he stated that he owned the apartment that Barton was staying at but was not at home of the time of the robbery.  Fatjo returned to his apartment to find that someone had knocked over items and pulled out drawers and that a small lockbox with money was missing.

ransacked Fatjo's residence and eventually left by jumping from a back second-story balcony. Barton stated that he thought the subjects had left because Harris' friends were coming up the stairs toward the house.

Barton described the first assailant as about 5'6" tall, with dark skin and a slim build, and said he had been wearing a green parka or winter coat.[4] Barton stated that the man had four gold front teeth.

After this interview, Detective Gandy left a card on Barton's door, paged him twice, and sent a citizen contact letter to his address. Gandy never heard from Barton after their initial interview.

Petition for Writ of Actual Innocence

On June 13, 2018, pursuant to Code § 19.2-327.10, Madison filed a petition for a writ of actual innocence based upon newly-discovered nonbiological evidence. As stated in his petition, Madison's claim of innocence was based upon affidavits from Harris, Barton, and a third individual, Jamar Hodge, whose affidavit consisted of a confession to the crime.

On November 16, 2018, the Commonwealth moved to dismiss Madison's petition. In its motion, the Commonwealth argued that the newly-discovered evidence was not material and did not constitute clear and convincing evidence supporting Madison's claim of innocence.

On April 23, 2019, pursuant to Code § 19.2-327.12, this Court remanded the matter to the circuit court for an evidentiary hearing for the purpose of taking testimony from Jamar Hodge and Joseph Barton.[5] Regarding Hodge, our Court instructed the circuit court to make findings of fact as to whether Hodge would state under oath that he had participated in the 1997 Virginia Beach robbery and would state that Madison had not been a participant in the robbery, as well as "[a]ny other enumerated findings of fact specifically related"

---

[4] However, while Detective Gandy's investigative report indicates that Barton had described the first assailant as about 5'6" tall, in Barton's handwritten statement that he provided to Gandy shortly after the incident, Barton states that the first assailant was about 5'10" tall.

[5] Following the filing of the initial pleadings in this petition, our Supreme Court issued Dennis v. Commonwealth, 297 Va. 104 (2019). We asked the parties for supplemental briefing addressing whether the holding of Dennis indicated that further factual development through an evidentiary hearing was required in this case. After reviewing the supplemental briefing, we concluded that an evidentiary hearing was required but that further factual finding by the circuit court was only required for two of the three potential witnesses in the case, Barton and Hodge.

to those questions. Regarding Barton, this Court instructed the circuit court to make findings of fact as to whether Barton would state under oath that he had been a victim of the 1997 Virginia Beach robbery and that he had later seen a perpetrator of the robbery whom he identified as someone other than Madison, as well as "[a]ny other enumerated findings of fact specifically related" to those questions. The remand order also directed the circuit court to make factual findings as to: (1) the apparent sincerity, conscientiousness, intelligence, and demeanor of both witnesses that it found relevant to assessing the truthfulness of their testimony; and (2) whether, in the exercise of diligence, the evidence could have been "discovered or obtained before the expiration of 21 days following entry" of the final order of conviction by the circuit court.

The circuit court held an evidentiary hearing on June 24, 2019. At the hearing, Barton testified as to the events of the evening of January 12, 1997 as he recalled them. Jamar Hodge was then called as a witness for Madison, but he invoked his Fifth Amendment right against self-incrimination and refused to testify.

Counsel for Madison then called three witnesses—Erik Kempf, Matthew Engle, and Hannah Thibideau—to testify as to statements that Hodge had previously made to them that counsel asserted were against Hodge's own interest. Counsel argued that this testimony was relevant as to this Court's specific remand directive for the circuit court to make "other enumerated findings of fact specifically related to" the questions of whether Hodge would state under oath that he had participated in the robbery in Virginia Beach and whether he would state that Madison had not been a participant. The Commonwealth objected, arguing that such testimony was not relevant as to the questions before the circuit court because Hodge had not testified at the hearing. The court reserved its ruling and allowed the witnesses to proffer their testimony. The court then later ruled that it would not consider the proffered testimony of Kempf, Engle, and Thibideau because the proffered testimony was not relevant to the questions at issue in the remand order.[6]

---

[6] The circuit court further found that the proffered testimony was not admissible as an exception to the hearsay rule as statements against Hodge's penal interests.

Following the evidentiary hearing, the circuit court issued its written findings of fact, as outlined below.[7]

## ANALYSIS[8]

"Code § 19.2-327.10 confers original jurisdiction upon this Court to consider a petition for a writ of actual innocence based on non-biological evidence." Phillips v. Commonwealth, 69 Va. App. 555, 562 (2018) (quoting Bush v. Commonwealth, 68 Va. App. 797, 803 (2018)). The petitioner has the burden of proof in a proceeding under the actual innocence statutes. See Code § 19.2-327.13. A petitioner can only obtain a writ of actual innocence if this Court finds by "clear and convincing evidence" that he has proven all of the allegations required under Code § 19.2-327.11(A)(iv) through (viii), and upon a finding that no rational trier of fact would have found proof of guilt beyond a reasonable doubt. Code § 19.2-327.13. Thus, a petitioner must prove by clear and convincing evidence that the newly-discovered evidence:

> (1) "was previously unknown or unavailable to the petitioner or his trial attorney of record at the time the conviction became final in the circuit court;" Code § 19.2-327.11(A)(iv),
>
> (2) "is such as could not, by the exercise of diligence, have been discovered or obtained before the expiration of 21 days following entry of the final order of conviction [. . .] by the court;" Code § 19.2-327.11(A)(vi),
>
> (3) "is material and when considered with all of the other evidence in the current record, will prove that no rational trier of fact [would] have found proof of guilt beyond a reasonable doubt;" Code § 19.2-327.11(A)(vii), and
>
> (4) "is not merely cumulative, corroborative or collateral." Code § 19.2-327.11(A)(viii).

Carpitcher v. Commonwealth, 273 Va. 335, 343-44 (2007).

---

[7] In an order dated August 1, 2019, the circuit court adopted the Commonwealth's proposed findings of fact.

[8] In petitioner's opening brief, he makes several arguments challenging the circuit court's factual findings. However, we note that under the actual innocence statutes, "the General Assembly has not afforded petitioners filing such claims a statutory right to contest the circuit court's factual findings in the Court of Appeals before the Court of Appeals enters judgment in the case . . . ." Carpitcher v. Commonwealth, 273 Va. 335, 348 (2007).

"'[C]lear and convincing evidence' must be convincing enough to render the assertion to be proved *'highly probable or reasonably certain.'*" In re Brown, 295 Va. 202, 228 (2018) (quoting Black's Law Dictionary (10th ed. 2014)). The clear and convincing standard "cannot be met with evidence that leaves 'competing inferences "equally probable."'" Id. at 227 (quoting Edmonds v. Edmonds, 290 Va. 10, 22 (2015)). "'More likely than not' proof falls short of that standard, as does, all the more, a mere evidentiary equipoise." Id. at 228 (quoting In re Watford, 295 Va. 114, 124 n.12 (2018)).

In the instant petition, Madison's claim of innocence rests on Kevin Harris' purported recantation, Joseph Barton's assertion that Madison was not involved in the crime, and Jamar Hodge's confession to the crime and statement that Madison was not involved in the crime. We assess the evidence and statements individually under Code § 19.2-327.11(A), and then consider the totality of the evidence Madison has presented in support of his claim of innocence. Code § 19.2-327.13. Having considered the entire record, we hold that Madison's evidence does not establish that he is entitled to a writ of actual innocence.

Kevin Harris

In an affidavit dated April 27, 2012, Harris stated that he was asked to discuss the details of the January 12, 1997 robbery by members of the Innocence Project at the University of Virginia. In his recitation of the events of that evening, Harris stated that he was home alone when someone knocked on his door. He recognized this individual as his neighbor, Barton. Barton asked Harris if he knew someone named Trina and asked to use his phone. Harris stated that a man (the "first assailant") was with Barton and asked to use the bathroom. Harris then headed toward the apartment door, and when he opened it he saw a man with a gun (the "second assailant").

Unlike his testimony at trial, Harris did not indicate in his affidavit that the second assailant robbed him of a gold chain. Rather, he stated that when he opened his door, the second assailant motioned for four or five other individuals to enter the apartment. The men ransacked Harris' home. The second assailant kept asking Harris where the cocaine was located, but Harris denied knowing anything about any drugs. He also noted that the second assailant had a gun with a silencer. The other individuals started "roughing Barton up

-9-

and pistol-whipping him." They then forcibly removed Barton from the apartment. Harris was "hog-tied" and placed face down in the bathtub.

Harris, who is 5'8" tall, described the first assailant as a little taller than him and "dark-skinned . . . with gold teeth."[9] The second assailant was also a little taller than Harris.

Regarding his identification of Madison, Harris stated in his affidavit that after he chose Madison's photo in the lineup, Detective Gandy told him that Madison had been implicated in the robbery. Harris stated that he "felt personally like [he] was being led during the identification process." Harris also stated that while he was at court to testify in the case, he was told by Gandy that the same person who had robbed him had "tried to do it to a woman and that when police came there was a shootout and a police dog died." Harris believed that this conversation took place before he testified because he recalled leaving the courthouse right after he gave his testimony.

Harris' affidavit ended with his statement that

> [a]fter hearing from Lee Madison[10] about the evidence that has come out since [Madison's] trial showing that other people, not associated with Madison, committed this robbery, I am no longer confident that my identification of Madison was correct, and I regret that the wrong person is in prison for this offense.

As an initial matter, we reject Madison's characterization of Harris' affidavit as a "recantation." In Harris' affidavit, he stated that he is "no longer confident that my identification of Madison was correct, and I regret that the wrong person is in prison for this offense." Harris does cast doubt on his previous identification of Madison by stating that he is "no longer confident" that his identification was correct. Further, the last part of Harris' statement—that he "regret[s] that the wrong person is in prison for this offense"—implies that Harris now believes that his former identification was incorrect. However, casting

---

[9] This description differs from Harris' initial description at trial, in which he indicated that the second assailant, whom he identified as Madison, was the man with four gold teeth—not the first assailant.

[10] Lee Madison is the uncle of petitioner Madison.

doubt on a prior identification or implying that the prior identification was not correct is not enough; to be credited as a "recantation," a victim must actually state that his prior identification was in error. See Recant, Black's Law Dictionary (11th ed. 2019) (defining the word "recant" as "[t]o withdraw or renounce [ ]prior statements or testimony[ ] formally or publicly"). Here, absent from Harris' affidavit is a clear statement that Madison was not the assailant who robbed him the evening of January 12, 1997. Because Harris' statement provides no more than speculation that his prior identification of Madison as the perpetrator might have been in error, it does not rise to the level of an actual recantation of the identification.[11] See Phillips, 69 Va. App. at 564 (rejecting petitioner's characterization of the victim's statement as "a recantation" where the victim said in her new statement that she "could have identified the wrong man" but did not actually state that petitioner had not been her attacker).

In addition, even if we were to consider Harris' affidavit an actual recantation of his previous identification, we conclude that Madison has not proven that this evidence is material. As noted above, to satisfy the requirements of Code § 19.2-327.11(A)(vii), a petitioner must prove by clear and convincing evidence that the newly-discovered evidence (a) is material, and (b) when considered with all of the other evidence in the record, proves that no rational trier of fact would have found proof of guilt beyond a reasonable doubt. See Code §§ 19.2-327.11(A)(vii), -327.13. "[T]o be 'material,' within the meaning of Code § 19.2-327.11(A)(vii), evidence supporting a petition for a writ of actual innocence based on

---

[11] Our conclusion to not credit Harris' affidavit as a proper recantation is further supported by certain details of Harris' affidavit. In the affidavit, Harris specifically stated that after he heard from Lee Madison about "evidence that has come out since [Madison's] trial showing that other people, not associated with Madison, committed this robbery, I am no longer confident that my identification of Madison was correct, and I regret that the wrong person is in prison for this offense." It is unclear what information was presented to Harris by Lee Madison, petitioner's uncle, and what influence this information had on Harris' recantation. We therefore view the statements made in the affidavit with more skepticism than if they had been made unprompted or without knowledge that other individuals had cast doubt on Madison's guilt. See Phillips, 69 Va. App. at 566 (declining to credit a victim's recantation in part because it was unclear whether the victim, who had been given information that petitioner's DNA was not found on a piece of her clothing, had also been given information indicating that DNA results were inconclusive and did not actually exonerate petitioner).

non-biological evidence must be true." Dennis v. Commonwealth, 297 Va. 104, 124 (2019) (quoting Carpitcher, 273 Va. at 345). "The materiality inquiry is particularly important when a petition for a writ of actual innocence is based largely on a recantation because, '[u]nless proven true, recantation evidence merely amounts to an attack on a witness' credibility by the witness [himself].'" Id. at 128 (quoting Carpitcher, 273 Va. at 346). "Because victims' recantations are often unreliable, it is rare that a petitioner can offer clear and convincing evidence that the recantation is true and it is the trial testimony that is false." Montgomery v. Commonwealth, 62 Va. App. 656, 675 (2013).

We find that Madison has not met the burden of proving that Harris' statement that he was "no longer confident" in his identification is "true." Dennis, 297 Va. at 124 (quoting Carpitcher, 273 Va. at 345). Harris' new statement directly contradicts his testimony at trial, Detective Gandy's testimony at trial, and Detective Gandy's recollection as stated in his affidavit. At trial, Harris identified Madison as the second assailant that entered his apartment, held a gun to his head, and took his gold chain. Harris testified that he recognized Madison based upon his slim face, skin tone, and four gold teeth. He noted at trial that Madison's face was uncovered during the robbery. Harris also testified at trial that Detective Gandy did not indicate in any way which suspect to choose from the photo lineup. Detective Gandy testified that prior to showing Harris a photo lineup, he told Harris to take his time looking at the photos, and that Harris took less than a minute to identify Madison as the person who had robbed him. While Harris stated in his affidavit that he felt that he was "being led during the identification process," this statement contradicts his testimony at trial. It also contradicts Detective Gandy's recollection, as stated in his affidavit, that he did not "attempt to influence, coach or lead Mr. Harris into making the identification."

This Court is now presented with nothing more than evidence that Harris spoke differently on two separate occasions regarding his identification. Without more evidence, we cannot conclude that Harris' current statement regarding the identification is "true" as opposed to his prior identification made during the photo lineup and at trial.

In addition, "[t]raditionally, courts view recantations with 'great suspicion.'" Haas v. Commonwealth, 283 Va. 284, 292 (2012) (quoting Dobbert v. Wainwright, 468 U.S. 1231, 1233-34 (1984)). Our skepticism of recantations

> increases with the passage of time. Recantation evidence appearing long after the trial has ended places the opposing party at a disadvantage similar to that which justifies statutes of limitations. Memories may have faded, witnesses may have disappeared or become incapable of testifying, physical evidence may be unrecoverable and the recanting witness may have had ample time to acquire an extraneous motive to falsify his original testimony.

Id. Here, we note that Harris' affidavit was made on April 27, 2012, fifteen years after the robbery that occurred in January 1997.

As noted above, there is a high burden for a petitioner to establish that newly-discovered evidence is material—he must prove that it is true. Dennis, 297 Va. at 124. Madison's proffered evidence in the form of Harris' affidavit fails to meet this burden. Therefore, we hold that Harris' recantation was not "material" to the issue of actual innocence within the meaning of Code § 19.2-327.11(A)(vii).

Joseph Barton

In Barton's affidavit, dated February 16, 2018, he stated that he was asked to discuss the details of the January 12, 1997 robbery by members of the Innocence Project at the University of Virginia. Regarding the robbery, Barton stated that he was alone at his friend's apartment when he heard a noise from outside and saw a "suspicious looking vehicle with six people in it." Barton became uncomfortable and prepared to leave. As he exited, he saw a man walking up to the apartment door from the bottom of the stairs (the "first assailant"). Barton asked the first assailant what he wanted, and the man replied that he was looking for a girl. Barton either replied that he did not know her or that she was not there, and the first assailant started walking back to the vehicle. Barton started to walk to his house but "detoured" to an apartment downstairs when some men got out of the car. He reached the door of the downstairs apartment at the same time as one of men from the car (the "second assailant"), and Harris let both men into his home. Once inside, the second assailant pulled out a gun and hit Barton in the face with it at least twice. Several other individuals then entered the apartment

and asked where the drugs were located. One of the men walked Barton back to the first apartment with a pistol pointed at his back, and once inside that apartment, Barton heard the men ransacking it for either money or drugs. Barton was left face down as the men exited the apartment.

Barton described the first assailant as dark skinned, in his early twenties, and about 5'8" to 5'10" tall. He wore surgical gloves but not a mask. Barton described the second assailant as brown-skinned and armed with a 9 millimeter black pistol with a silencer.[12]

In his affidavit, Barton further stated that while at a nightclub about three months after the robbery, he recognized the first assailant, who then quickly left the club. Barton asked a friend who that person was, and he was told that the man went by the name Black Jay. Barton later heard that another man, Goo Gang, was known to engage in illegal activities with Black Jay at that time. Barton stated that he later ran into Lee Madison, petitioner's uncle. Barton was surprised to hear that anyone had been arrested for the crime because he "knew who committed the crime, and it was not . . . Madison."

At the evidentiary hearing, Barton testified as to the events of the evening of January 12, 1997 as he recalled them. His testimony mostly followed his account of the evening as stated in his affidavit. However, unlike the affidavit, where he stated that an unknown individual hit him with a gun, he testified at the hearing that Black Jay was the individual that struck him with a gun. Barton also testified that after Black Jay struck him he told Barton to "face the wall," at which point several other men entered the apartment. The only description he could give of these individuals was that one was "brown-skinned-looking," and he did not recall how many individuals had entered the apartment. In addition, he provided a further detail about his location in the apartment during the robbery—that he was near the front entrance with Black Jay the entire time. Barton testified that once the other individuals were inside the apartment, he could not see what was happening to Harris because those men took Harris to the back of the apartment while he remained with Black Jay by the front entrance. Barton was unable to see anyone else in the back of the apartment. He also

---

[12] This differs from the description that Barton initially provided to Detective Gandy—that the first assailant rather than the second assailant had a 9 millimeter pistol with a silencer.

testified that he did not get "a good look" at the faces of anyone involved with "holding" Harris during the robbery.

At the hearing, Barton was asked if he recognized a copy of the subpoena for him to appear as a witness in Madison's original trial. He replied that he did not, and was then asked if he had lived at 1514 Benton Court in Virginia Beach prior to September 3, 1997.[13] Barton replied that the address was "one of [his] past addresses," but he could not recall the "exact time period [he] was living there." He did not recall being served with a subpoena to appear in the case. He stated that if he were subpoenaed to come to court, he "would probably be fearful that something would happen if [he] didn't come to court." Barton had also testified at the hearing that in 1997 he was a student at Norfolk State University.

Barton also testified that he did not recognize Madison, who was present at the hearing, as an assailant who was present during the robbery. He noted that he did not remember that any of the assailants were as short as Madison.

In its written findings of fact, the circuit court made several factual findings. It found that Barton had affirmatively stated under oath that he had been the victim of a robbery in Virginia Beach in 1997 and that he had later seen a perpetrator of the robbery, Black Jay, at a nightclub at some point in time after the robbery. The court also found that Barton had been unable to identify any of the other perpetrators involved in the robbery, including the person who personally robbed Harris. It noted that Barton had testified that he was facing the wall when the others involved in the robbery entered Harris' apartment, did not know how many men had entered, could not see what happened to Harris, and at most could only say that one of the other assailants was brown-skinned. The court further noted that Barton had indicated he did not remember any of the assailants being as short as Madison. The court found "much of . . . Barton's testimony to be credible.

---

[13] The subpoena for Barton from Madison's original trial was not entered into evidence at the evidentiary hearing. However, the circuit court noted in its factual findings that a copy of the subpoena was in the court's "criminal case file," and that the 1514 Benton Court address was the address listed on the subpoena.

[He] appeared to be calm and forthright in responding to questions . . . [and] acknowledged there were certain aspects of the robbery that he could not recall."

In addition, the court found that the information provided by Barton could have been discovered within 21 days following entry of the final order of conviction by the circuit court. In making this finding, the court first noted that Barton had been available to Madison from the time he was charged with the offenses through 21 days following entry of the final order of conviction. In making this determination, the court noted that Barton had testified that he had been a student at Norfolk State University in 1997 and did not indicate at the evidentiary hearing that he had not been in the Virginia Beach area during the pendency of the proceedings against Madison. Further, a subpoena that was served on Barton for Madison's trial was in the court's criminal case file. While Barton testified that he did not recall being served with the subpoena, he did admit that he had lived at the address where the subpoena was served "from some period of time." Second, the court noted that Barton would have been aware of all of the information about which he testified at the evidentiary hearing prior to Madison's trial. The court noted that the robbery occurred on January 12, 1997 and that Barton testified that he had learned of an assailant, Black Jay, within a few months of the robbery. The court found that this would have been before Madison's bench trial on October 1, 1997, and well before his final order of conviction was entered on November 19, 1997.

After examining Barton's affidavit, testimony at the evidentiary hearing, and the circuit court's factual findings, we conclude that this evidence in total does not support Madison's petition.

First, we find that this evidence does not provide clear and convincing evidence supporting the conclusion that no rational trier of fact would have found proof of guilt beyond a reasonable doubt. See Code § 19.2-327.11(A)(vii).

Barton states in his affidavit that he knew who committed the 1997 robbery and that it was not Madison. Barton's basis for this belief was his later identification of one of the perpetrators of the robbery, Black Jay. Barton also testified at the evidentiary hearing that he did not recognize Madison as one of the assailants. However, we conclude that Barton's statements do not definitively exculpate Madison because

-16-

there were several assailants involved in the robbery and Barton was only able to identify one of them, Black Jay.

At trial, Harris testified that a second assailant, who entered his apartment after Barton and a first assailant, hit Harris in the eye with his gun, put Harris on the floor while holding a gun to his head, and then took his gold chain. Harris identified this individual as Madison. At trial, Harris testified that another assailant was with Barton by the door at this time. This testimony matches Barton's testimony from the evidentiary hearing, in which he stated that during the robbery he could not see what was happening to Harris because Harris was in the back of the apartment and Barton was by the front door. Further, Barton acknowledged during his testimony at the evidentiary hearing that during the robbery, he was only able to see the face of one of the assailants, Black Jay. Barton testified that he could not identify any of the other assailants. The circuit court found "much of . . . Barton's testimony to be credible" and noted that he "appeared to be calm and forthright in responding to questions."

In light of Barton's inability to identify any of the other perpetrators other than Black Jay, Barton's testimony does not exculpate Madison. Reviewing the evidence related to Barton, we find that it does not provide clear and convincing evidence supporting the conclusion that no rational trier of fact would have found proof of guilt beyond a reasonable doubt.

Second, we conclude that the information provided by Barton is not evidence that was "previously unknown or unavailable" to Madison or "such as could not, by the exercise of diligence, have been discovered or obtained" before Madison's conviction became final. Code §§ 19.2-327.11(A)(iv), -327.11(A)(vi). As noted by the circuit court, Barton testified at the evidentiary hearing that he was a student at Norfolk State University in 1997. Barton did not indicate that he had moved away from Virginia Beach before Madison's trial. Also, the circuit court found that Barton admitted that the address where a subpoena for Madison's trial was served by the Commonwealth's Attorney's Office was his address for some period of time. Based on

these facts, we conclude that Madison could have contacted Barton prior to the trial if Madison had exercised diligence in attempting to locate him.[14]

Further, it is clear that Barton would have been aware of the information that he provided in his affidavit and at the evidentiary hearing prior to Madison's trial. Barton testified that he learned the identity of one of the assailants, Black Jay, within a few months of the robbery. As the robbery occurred on January 12, 1997, this encounter with Black Jay would have occurred before Madison's bench trial on October 1, 1997, and well before the final order of conviction was entered on November 19, 1997.

Thus, Madison has not proven through clear and convincing evidence that Barton's information could not have been discovered in the exercise of diligence prior to the date when his convictions became final.

Jamar Hodge

In an affidavit signed March 11, 2014, Jamar Hodge stated that he was a prisoner at FCI Forrest City[15] serving a thirty-year sentence.[16] On that date, he was interviewed by members of the Innocence Project at the University of Virginia. Hodge states that his street name was Black Jay. He remembered that in January 1997 he robbed a second-floor apartment behind Picasso's Club in Virginia Beach. Hodge targeted this

---

[14] Madison argues that Barton's information could not have been discovered or obtained through the exercise of diligence prior to the expiration of 21 days following entry of the trial court's final conviction order because of evidence in the record demonstrating that Barton was not cooperative with the police investigation. We reject this contention, noting that "[t]he noun 'diligence' means 'devoted and painstaking application to accomplish an undertaking.'" Dennis v. Jones, 240 Va. 12, 19 (1990) (quoting Webster's Third New International Dictionary 633 (1981)). Here, there is no evidence that Madison exercised any diligence in trying to locate and speak to Barton at any time prior to trial. Further, even if Madison were relying on Barton to appear at trial due to the Commonwealth's subpoena, he could have attempted to contact him following trial and prior to the expiration of 21 days following the entry of the final conviction order when Barton failed to appear at trial. Although the record shows that Barton was uncooperative with police, there is also no evidence in the record demonstrating the exercise of *any* diligence on Madison's part.

[15] FCI Forrest City is a federal prison located in Arkansas.

[16] This document was notarized by Matthew Engle, who at the time was a lawyer for the Innocence Project at the University of Virginia. The Commonwealth argues that this document does not constitute an actual affidavit, or statement under oath, because Engle was a notary in Virginia at the time but not a notary in Arkansas where the affidavit was executed. However, because we conclude that even if we construe the document as a properly executed affidavit, Hodge's statement is not material to the issue of Madison's innocence, we need not determine what effect the notary issue had as pertains to the document.

-18-

apartment because a woman told him that there would be money there. He stated that after he and Howard Booth, his accomplice, knocked on the apartment door, a man opened it, and they made up a woman's name to have him let them in. The man told them that the woman lived in a nearby apartment, and they followed him to that apartment. Once inside the second apartment, Hodge went into the bathroom and took out a gun and went back into the apartment. Booth also pulled out his gun, and they started asking about money and drugs.

While Hodge and Booth were in the apartment, several of Hodge's associates were outside in his gray four-door Buick. Hodge states that these individuals were named Ernest Knox, Ken Ken Knox, Tony Booth, and that a fourth man named P-Red was also possibly with them at that time.[17] Ernest Knox wore four gold teeth. Another associate of Hodge's, Samuel Wallace, known as Goo Gang, was not with him during the robbery. However, people "on the street" knew that Goo Gang and Hodge were close friends and would have associated them with each other.

The men in the car eventually entered the second apartment, and at some point they all took the first man back to the first apartment. The men took a small safe containing money and checks from this apartment. They jumped off the apartment's rear balcony because people were coming toward the apartment door.

Hodge states that he did not know Madison and that Madison had not participated in the robbery. Further, he agreed to sign the affidavit because Hodge "knew [Madison] is innocent of this crime and it is the right thing to do."

At the evidentiary hearing, counsel for Madison called Jamar Hodge as a witness. However, Hodge invoked his Fifth Amendment right against self-incrimination and refused to testify.

Following the evidentiary hearing, the circuit court found that, in light of his refusal to testify, Hodge had not affirmatively stated under oath that he had participated in a robbery in Virginia Beach as described in

---

[17] At the evidentiary hearing, Sergeant Kempf testified that Boothe and Ernest Knox were both deceased.

his affidavit, and further found that Hodge had not affirmatively stated that Madison was not a participant in such a robbery. Due to his refusal to testify, the court made no findings regarding Hodge's sincerity, conscientiousness, intelligence, and demeanor. In addition, due to Hodge's refusal to testify, the court made no findings relating to whether any of the information that he would have provided under oath would have been available within 21 days following entry of the final order of conviction by the circuit court.

The burden is on Madison to prove that the newly-discovered evidence, Hodge's confession, "is material and when considered with all of the other evidence in the current record, will prove that no rational trier of fact [would] have found proof of guilt beyond a reasonable doubt." Code § 19.2-327.11(A)(vii). We conclude that Hodge's confession has not been proven to be material in this case.

Here, we have Hodge's statement, made in the affidavit, that he participated in the January 1997 robbery in Virginia Beach and that Madison was not present during the robbery. The affidavit includes several details describing a robbery that is similar to the accounts given by Harris and Barton.[18] In order to assess the credibility of these statements, the circuit court in this case was given the opportunity to hear Hodge's testimony during an evidentiary hearing. However, Hodge refused to testify at the evidentiary hearing, and therefore the court found that he would not affirmatively state under oath that he had participated in the robbery and that Madison had not. This Court is then left only with Hodge's statements made in his affidavit, untested by any cross-examination and without the benefit of factual findings as to Hodge's sincerity or demeanor. Without more, we find that Hodge's confession as made in the affidavit does not meet

---

[18] However, Hodge's account does not exactly match the details of the robbery provided by Harris and Barton. In his affidavit, Hodge states that both he and Howard Booth knocked on the door of a second-floor apartment, encountered a man inside, and then followed this man into a second apartment. Contrary to this account, Harris consistently stated that a first assailant entered his apartment with Barton, and then a second assailant later entered the apartment. Likewise, Barton, in all his accounts of the robbery, stated that a first assailant, who was alone at the time, met him right outside of his apartment or in his doorway.

the high burden necessary for us to find that the evidence of Hodge's confession is material, or true.[19] Dennis, 297 Va. at 124.

We emphasize, as we must, that there is a high burden for a petitioner to prove materiality under the actual innocence statutes. "Requiring 'material' evidence to be 'true' is consistent with the statute's legislative purpose." Montgomery, 62 Va. App. at 674 n.6 (quoting Carpitcher, 273 Va. at 345). "By enacting the statute the General Assembly 'intended to provide relief only to those individuals who can establish that they did not, as a matter of fact, commit the crimes for which they were convicted," and did "not intend to provide relief to individuals who merely produced evidence contrary to the evidence presented at their criminal trial.'" Id. (quoting Carpitcher, 273 Va. at 345). Here, the evidence presented by Madison in regard to Hodge's confession failed to meet this high burden of proof, and we do not consider it material in relation to Code § 19.2-327.11(A)(vii).[20]

---

[19] This is especially clear when contrasting Hodge's confession with other statements that this Court has previously found material. In Montgomery, this Court found a victim's recantation material under Code § 19.2-327.11(A)(vii) when she pled guilty to perjury for testifying falsely at the original trial. 62 Va. App. at 676. Likewise, in Bush, this Court found a confession material when the person pled guilty to one of the two robberies at issue in the petition for actual innocence. 68 Va. App. at 808. While we do not hold that someone else's conviction for the offense is required to meet a petitioner's burden of proving that a confession is true, we find that in this case Madison has not met his burden in providing clear and convincing evidence that Hodge's confession is true.

[20] Madison argues that the credibility of Hodge's confession was supported by the testimony of Sergeant Kempf, and by that of Engel and Thibideau, the attorney and law student with the Innocence Project, and that the circuit court erred in finding that their testimony was not relevant.

At the evidentiary hearing, Sergeant Kempf proffered that Hodge had previously admitted that he had committed a robbery in Virginia Beach in 1997 and provided details of that robbery. Engle and Thibideau, who had both worked on Madison's case while at the Innocence Project at the University of Virginia, proffered that Madison had made statements to them about his involvement in a 1997 robbery committed in Virginia Beach and that they were present when his affidavit was created. Thibideau also proffered that she met with Hodge in 2019 to notify him of the upcoming evidentiary hearing, and that during this meeting, Hodge said that he did not deny any of the information contained in the affidavit.

We find, as the circuit court did, that the testimony of these witnesses was not relevant because it was outside the scope of this Court's remand order. The specific questions posed by this Court's remand order were whether Hodge would state, under oath before the circuit court, that he participated in a robbery in Virginia Beach in 1997 and that Madison was not a participant in the robbery. As Hodge clearly would not state anything under oath at the evidentiary hearing, the witnesses' testimony regarding Hodge's earlier statements made to them was not relevant as to the question of whether Hodge would make certain statements under oath during the evidentiary hearing. Their testimony was also not relevant as to "[a]ny other

Totality of the Evidence Review

After examining whether the petitioner has proven by clear and convincing evidence all of the allegations contained in clauses (iv) through (viii) of subsection A of Code § 19.2-327.11, Code § 19.2-327.13 requires the Court to find whether a rational trier of fact would have found proof of guilt beyond a reasonable doubt. In doing so, "this Court is to consider all of the evidence in the aggregate and to grant the writ if we determine that no rational factfinder would have found petitioner guilty beyond a reasonable doubt." Phillips, 69 Va. App. at 568. "It is not enough for a petitioner to merely establish the existence of some conflicting evidence that introduces the possibility of reasonable doubt." In re Watford, 295 Va. at 124. Instead, a petitioner's evidence "must establish such a high probability of acquittal, that [the reviewing court] is reasonably certain that no rational fact finder would have found him guilty." Id.

Upon review of the entire record, considering the old evidence together with the new, we conclude that Madison has not met his burden to show by clear and convincing evidence that no rational trier of fact would have found proof of guilt beyond a reasonable doubt.

While Harris now states in his affidavit that he is "no longer confident" in his identification, a jury would have to balance this evidence with Harris' initial identification and his trial testimony that his identification was not influenced by Detective Gandy, along with Gandy's statement that he did not pressure Harris into making an identification. We also find that a reasonable jury likely would be unpersuaded by stale information provided by Barton, especially in light of his testimony at the evidentiary trial that he was unable to see the person who robbed Harris. Furthermore, a reasonable jury would likely give little credit to Hodge's confession when he refused to testify in court under oath as to whether his confession as contained in his affidavit was true.

---

enumerated findings of fact specifically related" to the questions of whether Hodge would state, under oath before the circuit court, that he participated in a robbery in Virginia Beach in 1997 and that Madison was not a participant in the robbery. Testimony from other individuals about his prior statements was not relevant in this regard, because it could not assist the circuit court in making findings of fact regarding his refusal to make certain statements under oath at the evidentiary hearing. Lastly, we note that none of the three individuals had direct knowledge of the robbery.

Accordingly, we hold that Madison is not entitled to the writ and dismiss his petition.

This order shall be published.

A Copy,

Teste:

*original order signed by the Clerk of the*
*Court of Appeals of Virginia at the direction*
*of the Court*

Clerk