PUBLISHED

## *VIRGINIA:*

*In the Court of Appeals of Virginia on* **Tuesday** *the* **22nd** *day of* **March, 2022**.

Steven Emanuel Parson,                                                                                        Petitioner,

 against               Record No. 0762-21-2

Commonwealth of Virginia,                                                                               Respondent.


Upon a Petition for a Writ of Actual Innocence

Before Judges O'Brien, Callins, and Senior Judge Annunziata


In a petition filed on July 22, 2021, Steven Emanuel Parson seeks a writ of actual innocence under Code §§ 19.2-327.10 through 19.2-327.14. In 2016, Parson pleaded guilty to the first-degree murder of Dejon Wagstaff and use of a firearm in the commission of murder. By final order entered April 21, 2017, the Circuit Court of Henrico County sentenced him to forty years' active incarceration.

In support of his claim of innocence, Parson relies on an affidavit executed by his codefendant Timothy Garrison. Garrison averred in the affidavit that he, not Parson, fatally shot Wagstaff. The affidavit further states that although Parson was present at the scene of the murder, he "had nothing to do" with the killing. Parson states that the affidavit became available to him on November 4, 2020, when Garrison executed it. Having reviewed the petition and the accompanying exhibits, the Commonwealth's response, and the entire record, we conclude that Parson is not entitled to relief.

### BACKGROUND

Parson signed a written plea agreement in which he agreed to plead guilty to first-degree murder and use of a firearm in the commission of murder. In exchange for Parson's guilty pleas, the Commonwealth agreed to recommend a sentence of between twenty and forty years' active incarceration and to *nolle prosequi* four additional, related charges. During his plea colloquy with the trial court, Parson stated that he wished to plead guilty to the two charges specified in the plea agreement. He assured the trial court, among other

things, that he had discussed the charges with his attorney and understood them. Parson also confirmed that he had decided for himself to plead guilty because he was in fact guilty.

The trial court then reviewed the terms of the plea agreement with Parson, including the fact that Parson "would waive the right of the presentation of evidence and agree[d] that the attorney for the Commonwealth could summarize the evidence." Parson confirmed that the court had accurately summarized the terms of the agreement and that he did not have any questions. The court therefore found that Parson's pleas were "made knowingly, intelligently and voluntarily after advice from competent [c]ounsel."

The assistant Commonwealth's attorney gave a detailed proffer of the Commonwealth's expected evidence. On December 22, 2015, Wagstaff sexually assaulted Kiarra Trimiew, Parson's girlfriend at the time. Wagstaff had responded to Trimiew's internet posting advertising "her services as an escort." Following the assault, Trimiew's friend Tashema Peace took her to the hospital because she "was bleeding heavily." Trimiew called Parson from the hospital and informed him of the assault. Although Trimiew underwent a sexual assault examination and a physical evidence recovery kit was collected, Parson told her "not to tell the police what happened or make a report." Parson called Garrison and "told him what happened." Parson was "mad" at Wagstaff and threatened to kill him.

On the morning of January 13, 2016, Peace called Parson and told him that Wagstaff had responded to Peace's internet ad for escort services and requested a "date." When Peace asked Parson whether she should arrange a date with Wagstaff, Parson told her to "do what you do." Peace arranged to meet Wagstaff at a local restaurant and told Parson of the arrangement. Parson and Trimiew picked up Garrison and they parked across the street from the restaurant; they watched as Wagstaff arrived and picked up Peace. By prior agreement with Parson, Peace told Wagstaff to drive her to Glenwood Farms apartments.

When Wagstaff and Peace arrived at Glenwood Farms, Wagstaff parked "in the front row of the apartment buildings" and Peace made "an excuse to get out of the car." Parson entered the parking lot from the other end and parked his white Ford Explorer. Parson told Trimiew that he was "going to smoke" Wagstaff.

Wearing masks and carrying firearms, Parson and Garrison exited the Explorer and hid behind a bush between apartment buildings across from Wagstaff's vehicle. Peace saw Garrison "raise his gun and fire first." She then saw Parson "aiming and shooting," and saw "flashes from both guns." Peace saw Garrison fire twice, and "it appeared to her that he was trying to shoot at [Wagstaff's] tires to stop the vehicle from driving off." According to Peace, Parson "would not stop shooting."

Parson and Garrison then ran to the Explorer and sped off with Trimiew, leaving Peace behind. As Parson drove away from the apartment complex, he passed his friend Anthony on the street. Parson pulled over and told Anthony to "take" Trimiew. Anthony and Trimiew later picked up Peace and went to the residence of Garrison's girlfriend. When they arrived, Garrison was there. Garrison told them that the police had stopped Parson's car; he escaped but the police caught Parson.

The Commonwealth also would have presented the testimony of three disinterested eyewitnesses: Robert Hagemeyer, a maintenance man at Glenwood Farms; Malik Talley, who lived in the apartment across from where Wagstaff's vehicle was parked; and Todd Thomas, who lived in the apartment across from where Parson's Explorer was parked. Hagemeyer and Talley both heard "two bursts of shots, the first burst being two to three shots, which . . . sound[ed something like a firecracker." Both then "looked out to see where the shots were coming from" and saw Wagstaff's vehicle backing into a parking space while "taking on gunfire." Hagemeyer saw "a black male with a white mask holding a gun and shooting" at Wagstaff's vehicle. He saw "a second man standing by a white Ford in the parking lot" and "heard eight to ten more shots fired in rapid succession" that were "much louder than the first" shots.

Talley also stated that both males wore masks. Talley heard ten to twelve more shots after he looked out the window, which he described "as being much louder than the first." After Wagstaff's vehicle drove "up over the curb" and "crash[ed] into a tree," the two masked men ran to the white Ford Explorer and sped away. Thomas was in his residence and heard "approximately ten gunshots." When he looked out his back window, he saw a white Ford Explorer backed into a parking space about thirty yards from his back door.

After the shooting, Hagemeyer and Talley ran to Wagstaff's vehicle and attempted to render aid until the police arrived. Hagemeyer called 911 at 1:19 p.m., and Henrico County Police Officer Nagle arrived within two minutes. Nagle saw a single gunshot wound to Wagstaff's head and a handgun between Wagstaff's lap and the center console. Wagstaff was later pronounced dead at the hospital; the autopsy report confirmed that he died of a single gunshot wound to the head.

Based on the witness statements, officers were given a description of the Explorer. Officer Lanum passed Parson's Explorer driving in the opposite direction as it left the scene. By the time Lanum caught up with the Explorer, Parson had stopped the car and both he and Garrison had exited. Parson and Garrison ignored Lanum's commands to stop; Lanum apprehended Parson after a brief foot chase but Garrison escaped.

Forensics Detective John Carter located twelve ten-millimeter cartridge casings in the grass between two apartment buildings at Glenwood Farms, where the witnesses described the shooters had been standing. A search of the Explorer yielded a fully loaded ten-millimeter Glock under the driver seat and a twenty-two caliber Beretta pistol with an empty magazine in the seat pocket of the front passenger seat. According to a certificate of analysis prepared by the Department of Forensic Science ("DFS"), the twelve ten-millimeter casings found at the scene were fired from the Glock recovered from Parson's Explorer. DFS could not identify which weapon fired the bullet that killed Wagstaff but concluded that the bullet had "characteristics" consistent with those produced by the Glock.

Following Parson's arrest on January 13, Detective Ensor interviewed him after advising him of his *Miranda* rights. Parson told Detective Ensor "that before he was stopped by the police he was coming from Wawa and before that he was coming from Seven Gables apartments." He also stated, "that the person that was with him in the vehicle was James from the circle." Detective Ensor used a gunshot residue kit to test Parson's hands, and the subsequent DFS analysis "indicated that particles characteristic of primer residue were found" on Parson's hands.

-4-

Garrison was arrested on January 19, 2016.  The Commonwealth proffered that Garrison would have testified that he had heard Parson and Trimiew "arguing about letting someone sexually assault her" sometime before the shooting.  On January 13, 2016, Garrison was walking down the street when Parson drove up with Trimiew and Peace and agreed to give him a ride.  Parson dropped Peace off at the restaurant to meet Wagstaff and drove to Glenwood Farms.  Parson then told Garrison that he had something he "needed to handle."  Parson "drove into the parking lot and parked, gave Garrison a gun, and told him to get out of the car."  Parson and Garrison then "went behind some buildings, came through a cut," and saw Wagstaff's car.  Garrison did not know who was in the car, but Parson "pointed to it and said that's him."

Parson "told Garrison to shoot first," so he shot twice.  Garrison's gun made "what sounded like a soft bang or soft sound," and he "aim[ed] for the woods because he didn't want to hit the car."  Parson said "no, like this," stepped into the road, and began to fire rapidly at Wagstaff.  Parson's gun made "a very loud noise," and Garrison believed "that Parson fired until he emptied the clip."  Parson and Garrison then returned to the Explorer and left the scene, with Parson driving and Garrison in the passenger seat.  Garrison threw his gun out the window.  When the police stopped them, Garrison fled while the officers were speaking with Parson.

Phone records for Parson, Garrison, and Peace showed twenty-one calls between Parson and Peace between 12:00 p.m. and 1:22 p.m. on January 13, and six calls between Parson and Garrison between 12:14 p.m. and 12:16 p.m.  Parson also received a text message from Peace at 1:03 p.m., shortly before the murder, stating: "he pulling up."  The trial court found that the Commonwealth's proffered evidence was sufficient to support Parson's guilty pleas.[1]

---

[1] When the trial court asked defense counsel about the Commonwealth's proffer, counsel stated that Trimiew had later admitted she had lied to Parson about "some aspects" of the sexual assault.  She also told Parson that she had been pregnant with Parson's child and lost the child because of the sexual assault.  Parson further asserted that Garrison "was probably a lot more involved in" and knew more about the shooting than he admitted.  Parson did not otherwise object to or contradict the Commonwealth's proffer.

Garrison pleaded guilty to first-degree murder, robbery, and use of a firearm in the commission of felony under a written plea agreement.[2] The trial court sentenced Garrison to seventy-three years' imprisonment, with thirty-three years suspended. Trimiew and Peace each pleaded guilty to conspiracy to commit first-degree murder; the trial court sentenced each to eight-year active sentences. The written plea agreements for all three expressly provided: "The defendant agrees to fully, completely and truthfully cooperate with the Henrico Police Department and the Henrico Commonwealth's Attorney's Office in any further investigation and/or prosecution involving this matter."

Before his sentencing, Parson filed a *pro se* motion to withdraw his guilty pleas, asserting that his trial counsel had been ineffective by failing to inform him of the "danger [of] accepting an open plea," exposing Parson to a "harsh sentence" by failing to investigate the case, failing to interview a witness named by Parson, and using "tricks" to induce Parson to plead guilty. The trial court granted counsel's motion to withdraw and appointed new counsel to represent Parson.

At the sentencing hearing on April 21, 2017, defense counsel acknowledged that a defendant seeking to withdraw his guilty plea must show both a good-faith basis for doing so and a reasonable basis for contesting guilt at trial. Parson testified that he was thirty-two years old; he had a learning disability and a ninth-grade education. He met with his original trial counsel approximately four times between his arrest and the entry of his guilty pleas. According to Parson, counsel had explained the evidence to him but also said "they were still getting evidence in." Parson claimed that trial counsel "basically made [him] take" the plea deal because he would be convicted and be sentenced to life imprisonment if he went to trial.

The defense acknowledged that the Commonwealth had "provided an overwhelming amount of information in this case." Counsel argued that the best factual defense at trial would be the testimony of "a disinterested party" who only saw one person shooting a firearm at the scene of the murder. Counsel also

---

[2] Garrison's convictions for robbery and use of a firearm in the commission of a felony involved a different victim.

-6-

stated that this witness stated that the man "who fired the weapon had camo pants on." Counsel proffered that Parson "did not have anything camo on him" when he was arrested but "Garrison had a camo jacket on."

The defense further contended that evidence the Commonwealth produced in discovery indicated that Garrison had been involved in a robbery shortly before the murder and that Garrison's "M.O." was to rob individuals who had solicited prostitutes. He noted that there was no fingerprint, DNA, or blood evidence linking Parson to the Glock used in the murder. Finally, the defense asserted that the gunshot residue test may have mistakenly indicated primer residue on Parson's hands based on lead, barium, and antimony Parson contacted through his job as a steel fabricator.

In denying Parson's motion to withdraw his guilty pleas, the trial court noted that he had signed a clear and unambiguous plea agreement and the court had conducted a thorough plea colloquy to ensure that his pleas were knowing and voluntary. Further, considering Parson's statements under oath that he was pleading guilty because he was in fact guilty, the court found that Parson had not shown that he could present a reasonable factual defense at trial.

On appeal to this Court, Parson asserted that the trial court erred in denying his motion to withdraw his guilty pleas. This Court denied Parson's petition for appeal by one-judge order on October 18, 2017, and by three-judge order on November 30, 2017. *Parson v. Commonwealth*, No. 0743-17-2. We found no basis to disturb the trial court's finding that Parson's motion was not made in good faith and that Parson failed to show that he could present a reasonable defense because he had not offered any scientific support for his contention that his positive gunshot residue test resulted from chemicals he encountered at work. He also failed to establish a reasonable defense to the Commonwealth's alternative argument that he was guilty as a principal in the second degree. The Supreme Court of Virginia refused further appeal. *Parson v. Commonwealth*, No. 181151.

In June 2020, Parson filed a state *habeas corpus* petition, asserting that his convictions were invalid because trial counsel's "fail[ure] to adequately review the evidence" with him deprived him of the ability to make an informed decision on whether to accept the plea agreement. *Parson v. Clarke*, No. CL20-3593. He

also claimed that counsel representing him when he moved to withdraw his guilty pleas failed to adequately present that motion. Specifically, he contended that a "Prosecutor Report Narrative" produced by the Commonwealth during discovery contained evidence "consistent with someone else being the shooter" and with his claim that he "did not aid, abet, or encourage any homicide."

In a motion to amend his *habeas* petition, Parson asserted that trial counsel had falsely informed him that the Commonwealth did not have to prove guilt beyond a reasonable doubt and that "forensics and physical scientific evidence proves that only the [Glock] was fired and that . . . Garrison admitted to firing a weapon." The state *habeas* petition remains pending before the trial court.

### PETITION FOR A WRIT OF ACTUAL INNOCENCE

Parson relies on Garrison's November 4, 2020 affidavit in support of his claim of innocence. Garrison averred that he "was the person in the camo fatigue during the Dejon Wagstaff shooting that occurred on January 13, 2016" and that Garrison "was the only person to discharge a weapon on that day." Garrison explained that he had "attempted to defraud Wagstaff but when [he] approached [the] vehicle, Wagstaff drew a firearm so [Garrison] ran back towards Parson's vehicle." When Garrison "reached the other side of the apartments through the path, Wagstaff was backing into a parking space so [Garrison] shot at his car out of fear that he was going to shoot" Garrison. Garrison "was not trying to kill Wagstaff" and "Parson had nothing to do with the planning, looting, or shooting of Wagstaff."[3]

Parson asserts that Garrison's affidavit was previously unavailable to him and his trial attorney and that the materiality of the affidavit "must be determined at an evidentiary hearing." Parson further argues that no reasonable finder of fact would have convicted him of first-degree murder and use of a firearm in the commission of a felony in light of Garrison's affidavit. He asserts that he "has always maintained that he is innocent in the alleged planned robbery and shooting death of Wagstaff."

---

[3] Parson states that, on September 19, 2020, Daschon Winston informed Parson's family that Garrison was "seeking to reach out" to Parson "for the purpose of signing an affidavit to clear [Parson's] name for" Wagstaff's murder. Parson then retained counsel to obtain such an affidavit.

Parson argues that whereas Garrison "would have severely downplayed" his own role in the shooting in his testimony as proffered by the Commonwealth at the plea colloquy, Garrison's assertion in the affidavit that Garrison was the only shooter is "corroborated by the scientific evidence." Parson argues that "the forensic evidence found at the scene supports the theory that only one firearm was fired" because all twelve of the shell casings recovered at the scene were fired by the Glock found under the driver's seat of Parson's Explorer.

The Attorney General[4] responded to the petition on behalf of the Commonwealth as the Court directed.[5] The Attorney General contends that Garrison's affidavit is not material because Parson has not shown that it is true. Further, the affidavit does not establish that no rational trier of fact would convict Parson. Specifically, the Attorney General asserts that the record evidence strongly supports Parson's guilt as a principal in the first degree and under a theory of concert of action, or as a principal in the second degree.

ANALYSIS

"Code § 19.2-327.10 confers original jurisdiction upon this Court to consider a petition for a writ of actual innocence based on non-biological evidence." *Johnson v. Commonwealth*, 72 Va. App. 587, 596 (2020) (quoting *Phillips v. Commonwealth*, 69 Va. App. 555, 562 (2018)). Amendments to the actual innocence statutes in 2020 authorized this Court to consider an actual innocence petition filed by a petitioner who pleaded guilty in the trial court. *Id.* at 595; *see* 2020 Va. Acts chs. 993, 994. Even so, the burden of proof to establish his innocence rests with the petitioner. *Tyler v. Commonwealth*, 73 Va. App. 445, 460 (2021).

---

[4] Jason S. Miyares succeeded Mark R. Herring as Attorney General on January 15, 2022.

[5] The Attorney General attached numerous exhibits to his response, including the original audio recordings and transcripts of interviews with Trimiew, Peace, Hagemeyer, Talley, and Thomas. The Attorney General also attached a memorandum memorializing an October 15, 2021 interview with Garrison. Garrison stated that he wrote the affidavit and had his "people type it." Garrison declined to answer questions posed by the Attorney General's investigator.

To be entitled to a non-biological writ of actual innocence, the petitioner must present "new" evidence. *Id.* at 463. To meet his burden to show that the evidence upon which he relies is "new," a petitioner must prove both that it was previously unknown or unavailable to him and that it could not have been discovered or obtained by the exercise of diligence within twenty-one days after the entry of final judgment. *Id.*; *see also* Code § 19.2-327.11(A)(iv)(a), (vi)(a); *Bush v. Commonwealth*, 68 Va. App. 797, 804 (2018); *In re Neal*, 44 Va. App. 89, 90 (2004). Additionally, the evidence upon which the petitioner relies must be "material." Code § 19.2-327.11(A)(vii); *Tyler*, 73 Va. App. at 462; *Bush*, 68 Va. App. at 805-06.

The petitioner must also establish that the new and material evidence, "when considered with all of the other evidence in the current record, will prove that no rational trier of fact would have found proof of guilt . . . beyond a reasonable doubt." Code § 19.2-327.11(A)(vii); *Tyler*, 73 Va. App. at 462; *Bush*, 68 Va. App. at 805-06. Finally, evidence that is "merely cumulative, corroborative, or collateral" is insufficient to warrant a writ of actual innocence. Code § 19.2-327.11(A)(viii); *Tyler*, 73 Va. App. at 466; *Bush*, 68 Va. App. at 809.

The petitioner must prove all these elements by a "preponderance of the evidence." *Tyler*, 73 Va. App at 460-61 (internal alteration omitted) (quoting 2020 Va. Acts chs. 993, 994). "[T]he preponderance standard is satisfied when the evidence convinces a factfinder that a particular fact in dispute was 'more probable than not.'" *Id.* at 461 (internal alteration omitted) (quoting *Lysable Transp., Inc. v. Patton*, 57 Va. App. 408, 419 (2010)). "Because the General Assembly has mandated that a petitioner must prove 'all of the allegations contained in clauses (iv) through (viii) of subsection A of 19.2-327.11,' Code § 19.2-327.13, a failure of [Parson] to establish any one of the required facts requires us to dismiss his petition." *Id.* at 463.

Upon review, we conclude that Garrison's affidavit does not prove by a preponderance of the evidence that, "when considered with all of the other evidence in the current record," no rational trier of fact would find proof of guilt beyond a reasonable doubt. Code § 19.2-327.11(A)(vii). This Court recently noted that satisfying Code § 19.2-327.11(A)(vii) is a "daunting task." *Tyler*, 73 Va. App. at 469. "[I]t is not enough for [Parson] to convince us that some, many, or even most rational factfinders would have acquitted

-10-

him if presented" with Garrison's affidavit. *Id.* "He must prove that *every* rational factfinder would have done so." *Id.*

In assessing whether Parson has met his statutory burden, we begin by evaluating how a rational trier of fact would weigh the probative value of the proffered affidavit upon which he bases his claim of innocence. "Courts are justifiably leery of post-[conviction] statements by codefendants purporting to exonerate a cohort." *Knight v. Commonwealth*, 71 Va. App. 492, 509 (2020) (quoting *United States v. Bynum*, 3 F.3d 769, 773 (4th Cir. 1993)). We think that a rational fact finder would approach such evidence with equal skepticism. Initially, we note that Garrison's affidavit came more than three years after the trial court pronounced judgment against Parson. Moreover, Garrison is a convicted felon, so his credibility is subject to impeachment. *See Shifflett v. Commonwealth*, 289 Va. 10, 11 (2015) ("Virginia statutory provisions and common law allow the Commonwealth to impeach the credibility of a [witness] by asking if he has been convicted of a felony or a misdemeanor involving moral turpitude."); *see also* Code § 19.2-269; Va. R. Evid. 2:609(b). In addition, the affidavit itself neither acknowledges nor explains the fundamental inconsistencies between the Commonwealth's proffer of his expected testimony and the conflicting account in the affidavit. Those omissions are especially significant considering that Garrison's plea agreement required him to "fully, completely and *truthfully* cooperate" with the Commonwealth "in any further investigation and/or prosecution involving" Wagstaff's murder. (Emphasis added). The timing of the affidavit, Garrison's status as a convicted felon, and the failure to address the prior inconsistent statements diminish the affidavit's probative force.

Next, we assess the probative force of the affidavit in light of the record evidence. The record establishes that Parson repeatedly threatened to kill Wagstaff because he was angry about the assault on Trimiew. The phone records, documenting multiple calls between Parson and Peace, and between Parson and Garrison in the hour before the shooting put Parson at the center of the carefully orchestrated attack on Wagstaff. And Peace's text message to Parson immediately before the murder alerting him that Wagstaff was

"pulling up" corroborates Peace's account—supported by her own guilty plea to conspiracy to commit murder—that Parson arranged for Peace to lure Wagstaff to Glenwood Farms.

In addition, the unrecanted eyewitness accounts contradict Garrison's new assertion that he was the lone shooter. Specifically, Hagemeyer and Talley both heard two or three relatively quiet shots followed by a larger number of louder shots, a circumstance which suggests two shooters, not one. Peace also would have testified that both Parson and Garrison shot at Wagstaff. Hagemeyer and Talley's statements that both shooters wore masks contradict Garrison's assertion in the affidavit that Parson was unaware of, and did not participate in, any criminal activity. Finally, the gunshot residue test results corroborate the eyewitness accounts of two shooters. The test results indicated that Parson's hands had primer residue on them. Parson acknowledges the test results but challenges the validity of the test, as he did at sentencing, but he has never proffered any evidence to support his allegation that he contacted the chemicals at his job. Parson's unsupported challenge to the gunshot residue test results is not evidence. *See Knight*, 71 Va. App. at 518.

We acknowledge, but ultimately are unpersuaded by, Parson's argument that the physical evidence supports Garrison's new assertion that he was the lone shooter because police found only shell casings from the ten-millimeter Glock at the scene.[6] According to the Commonwealth's proffer, Garrison discarded his firearm before Officer Lanum stopped the Explorer. Further, Parson drove the Explorer away from the crime scene and the Glock was found under the driver's seat. Garrison's affidavit does not explain why he placed the murder weapon under Parson's seat or why he told the police he had discarded his firearm. Thus, the physical evidence does not support Parson's claim of innocence.

---

[6] The location and caliber of the shell casings the police recovered from the scene was part of the Commonwealth's proffered evidence.

Finally, we must assess the weight a rational trier of fact would assign to Parson's guilty plea, which fundamentally contradicts Garrison's affidavit.[7] This Court has not addressed the effect that a knowing and voluntary guilty plea has on a petitioner's subsequent claim of actual innocence since the enactment of the statutory amendments. In doing so now, we begin by noting "that a guilty plea 'admits all the criminating facts alleged and the statutory elements of the offense charged.'" *In re Watford*, 295 Va. 114, 126 (2018) (quoting *Hobson v. Youell*, 177 Va. 906, 912 (1941)). "Stated differently, a guilty plea allows a reviewing court to presume that sufficient evidence existed to support the conviction. Such a presumption may be strengthened by taking evidence in conjunction with the guilty plea." *Id.* The evidence presented at the guilty plea hearing provides a reviewing court with a record "against which any newly discovered evidence may be compared." *Id.* at 127.

In *Watford*, the Supreme Court "accord[ed] Watford's guilty plea little weight" because the record was "devoid of any mention of facts" supporting the plea, and Watford received "an unusually light sentence" for the "particularly heinous crime" at issue. *Id.* Here, by contrast, the Commonwealth made a detailed proffer of the expected trial testimony of multiple witnesses and introduced numerous exhibits, which all supported Parson's sworn acknowledgement of his guilt. Indeed, despite Parson's assertion in his petition that he "has always maintained that he is innocent," the record plainly establishes that he previously stated under oath that he was guilty of first-degree murder and use of a firearm in the commission of a felony. It is well established that "[s]olemn declarations [during a plea colloquy] in open court carry a strong presumption of verity." *Smith v. Brown*, 291 Va. 260, 265 (2016) (quoting *Blackledge v. Allison*, 431 U.S. 63, 74 (1977)) (second alteration in original). We find that a rational trier of fact would assign significant weight to Parson's prior sworn admission of guilt.

---

[7] Although Parson's plea no longer bars his claim of actual innocence, his sworn admission of guilt remains "one of many factors" the Court may consider in making its probabilistic analysis of how a reasonable fact finder would assess Parson's new claim of innocence in light of all the evidence in the supplemented record. *Cf. In re Watford*, 295 Va. 114, 126 (2018) (evaluating a claim for a biological writ of actual innocence despite a guilty plea).

Furthermore, the compelling implication of Parson's new assertion of innocence is that he lied during his plea colloquy to secure the benefits of the plea bargain[8]; namely, the *nolle prosequi* of additional charges and the cap on his active term of incarceration. Given the circumstances, we think it "highly unlikely" that a rational fact finder "would have sympathy for [Parson's] self-interested prevarication and trustingly accept his present protestations of innocence." *In re Brown*, 295 Va. 202, 231 (2018) (denying a biological writ of actual innocence). Rather, "it is far more probable that a typical jury would find that" Parson's sworn admission of guilt "diminishes his newly articulated claim of actual innocence." *Id.*

In sum, Parson has not met his burden to prove that *no* rational fact finder, when considering Garrison's affidavit together with all the other evidence in the record—including Parson's sworn admission of guilt—would find proof of guilt beyond a reasonable doubt.[9] *See Tyler*, 73 Va. App. at 469. "Because the General Assembly has mandated that a petitioner must prove 'all of the allegations contained in clauses (iv) through (viii) of subsection A of 19.2-327.11,' Code § 19.2-327.13, a failure . . . to establish any one of the required facts requires us to dismiss his petition." *Id.* at 463. Therefore, we dismiss Parson's petition.

This order shall be published.

A Copy,
Teste:

A. John Vollino, Clerk
*original order signed by a deputy clerk of the*
By: *Court of Appeals of Virginia at the direction*
*of the Court*
Deputy Clerk

---

[8] We note that an individual's decision to enter a guilty plea may be influenced by many different factors, and we are not establishing an inflexible rule as to how a rational fact finder would interpret a defendant's guilty plea in every factual situation.

[9] Parson asserts that Garrison's affidavit proves that no rational trier of fact would conclude that Parson shot a firearm at Wagstaff. He does not contest, however, that if a rational fact finder concluded that he orchestrated the shooting, he is guilty under the theory of concert of action. "[C]oncert of action [is] a species of accomplice liability, carrying with it the principle that the punishment imposed on each accomplice may be the same." *Velez-Suarez v. Commonwealth*, 64 Va. App. 269, 279 (2015) (quoting *Davis v. Commonwealth*, 36 Va. App. 291, 295-96 (2001)). "Concerted action is defined as '[a]ction that has been planned, arranged, adjusted, agreed on and settled between parties acting together pursuant to some design or scheme.'" *Hampton v. Commonwealth*, 34 Va. App. 412, 418 (2001) (quoting *Rollston v. Commonwealth*, 11 Va. App. 535, 542 (1991)).